# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re Urban Outfitters, Inc.<br>Securities Litigation | : | Master File |
| | : | No. 2:13-cv-05978-LFR |
| | : | |
| This Document Relates To: | : | |
| | : | |
| All Actions. | : | |

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ACTION ...................................................................1

II.  JURISDICTION AND VENUE ...............................................................5

III.  PARTIES .................................................................................................5

    A.  Plaintiff ...........................................................................................5

    B.  Defendants ......................................................................................6

IV.  SUBSTANTIVE ALLEGATIONS ......................................................10

    A.  Confidential Witnesses ................................................................10

    B.  Background of the Company and Its Brands ................................12

    C.  "Comparable" Sales Growth Is a Key Metric in the Retail Industry ...................15

    D.  Leading Up to the Class Period, the Urban Outfitters Brand Achieved Steadily Accelerating Retail Sales Growth .............................................18

    E.  In a Grim Teen Retail Market, Urban Outfitters Was Praised as the Lone Bright Spot for Its Spot-On Product Assortments ................................21

    F.  The Urban Outfitters Brand Had Begun to Slip in the First Quarter of Fiscal 2014, but Growth at Anthropologie and Free People Buoyed the Company ...................27

    G.  Defendants Recognized, or Were Severely Reckless in Not Recognizing, the Company's Vulnerability During the Class Period Resulting from Product Assortment Failures ...................31

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......34

    A.  Fourth Quarter 2013 ....................................................................34

    B.  First Quarter 2014 .......................................................................42

    C.  Second Quarter 2014 ...................................................................51

VI.  THE TRUTH IS REVEALED ..............................................................59

VII.  LOSS CAUSATION .............................................................................63

VIII.  ADDITIONAL SCIENTER ..................................................................67

i

A.    Retail Sales at the Urban Outfitters Brand Were the Company's Core Operations ................................................................................................68

B.    The Individual Defendants Had Access to Store Sales Data and Planned Promotional Activities Via the Company's Intranet................................69

C.    The Individual Defendants' Suspicious Insider Trading .......................69

IX.    PRESUMPTION OF RELIANCE ...................................................................70

X.    NO SAFE HARBOR ......................................................................................72

XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS.........................................73

COUNT I ........................................................................................................................75

COUNT II .......................................................................................................................80

By and through his undersigned counsel, Lead Plaintiff David A. Schwartz ("Plaintiff") alleges the following against Defendants Urban Outfitters, Inc. ("Urban Outfitters," "URBN," or the "Company"), Richard A. Hayne ("Hayne"), Frank J. Conforti ("Conforti"), and Tedford G. Marlow ("Marlow") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Urban Outfitters and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Urban Outfitters, the other Defendants, and related non-parties; (e) consultation with experts; and (f) interviews with factual sources, including individuals formerly employed by Urban Outfitters and other industry participants.

## I.      SUMMARY OF THE ACTION

1.      This is a federal securities class action against Urban Outfitters and certain of its officers for violations of the federal securities laws. Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of himself and all persons or entities who purchased or acquired shares of Urban Outfitters (the "Class") between March 12, 2013 and September 9, 2013, inclusive (the "Class Period"). Plaintiff alleges that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by misrepresenting and concealing information regarding failed product assortments and resulting deceleration in sales growth during the first half of fiscal year 2014, leading up to and including Urban Outfitters' crucial back-to-school

1

season. As a result of this fraud, as more fully described below, shareholders suffered millions of dollars in losses.

2. Urban Outfitters is a specialty retailer marketing fashion apparel, accessories, and home goods worldwide under five brands: the Urban Outfitters namesake brand; Anthropologie; Free People; Terrain; and BHLDN. The Company reaches its customers through 500 retail locations as well as direct-to-consumer channels such as catalogs and e-commerce websites. The Urban Outfitters, Anthropologie, and Free People brands are by far the Company's largest, collectively representing about 98% of fiscal year 2013 sales. In terms of annual sales volume and store footprint, the Urban Outfitters brand is the Company's most dominant.

3. Thus, the success of the namesake brand is crucial to the health of Urban Outfitters as a whole. This is particularly true in the teen retail market, where the Urban Outfitters brand is the Company's main draw. Teen retailers were suffering as the first half of 2013 unfolded, beset by unfavorable weather conditions, consumers feeling the pinch of a payroll tax increase, the absence of new "must-have" trends to drive mall traffic (colored denim had been all the rage in 2012), and an abundance of promotional and mark-down activity that ate away at retailers' profit margins. Investors took note as the industry contracted.

4. But Urban Outfitters remained the lone bright spot that year. Indeed, even prior to 2013, sales growth had been steadily improving, both for the Company and for the Urban Outfitters brand in particular:

| QUARTER | COMPANY GROWTH | BRAND GROWTH |
|---|---|---|
| Fourth Quarter 2012 (ending Jan. 31, 2012) | Up 2% | Up 3% |
| First Quarter 2013 (ending Apr. 30, 2012) | Up 2% | Up 6% |
| Second Quarter 2013 (ending Jul. 31, 2012) | Up 4% | Up 6% |
| Third Quarter 2013 (ending Oct. 31, 2012) | Up 8% | Up 7% |
| Fourth Quarter 2013 (ending Jan. 31, 2013) | Up 11% | Up 11% |

Investors were pleased to see that momentum continue into 2013, despite challenging market conditions. Sales growth for the Company remained elevated at 9% for the first and second quarters of fiscal 2014 (the quarters ending April 30 and July 31, 2013, respectively). The Urban Outfitters brand similarly maintained positive growth, at 6% and 5% for each respective quarter.

5. In August 2013, on the heels of the Company's second quarter 2014 success, analysts at Morgan Stanley praised the "Sunny URBN Skies Amidst Stormy Retail Clouds." "We think 2Q sales outperformance vs. peers demonstrates outstanding management execution." Indeed, throughout the Class Period, Defendants had given the market every reason to believe in the Company's prospects, particularly those of its namesake brand:

- March 11: "I would say, overall, sales trends continue to be strong and very much like what we saw in the fourth quarter and in the holiday sales. It's coming in reasonably along the lines of what we saw in January, which is a very strong performance on the part of Free People brands. And I would say Anthropologie is seeing some momentum gain, and so we are very pleased with that. And Urban is basically on par with what we saw in the fourth quarter." (Defendant Hayne, ¶94)

- March 11: "There is no reason to believe that we couldn't see a continued decrease in markdowns." (Defendant Hayne, ¶95)

- March 11: "So I think we are in a pretty healthy place right now [at the Urban brand], and I like it way the trends that we see in the market fashion-wise marry with the stories that we are telling at point of sale. We are just moving into a time period that the narrative in the business is in regard to the festival season which, as you can imagine, that works pretty well with our brand." (Defendant Marlow, ¶98)

- May 20: "While the turnaround at Anthropologie certainly helped to drive Urban's record first quarter sales, Anthropologie was not alone. The Free People brand produced outstanding comp gains across all of their channels. In fact, all brands continue to build upon the successes established last year, and each posted record first quarter sales." (Defendant Hayne, ¶118)

- May 20: "In regard to the Urban brand in the quarter, the focus really for -- key focus over the past year as you know has been distorting our opportunity through direct-to-consumer. We realized a very strong quarter, both in the North American and European market and direct.

3

> While our North American and European retail businesses did treat us
> positively, the distortion of the business really was in the direct side.
> We've been driving that through customer acquisition and retention along
> with increasing our style offer to customer." (Defendant Marlow, ¶120)

- August 19: "Turning to profits, higher sales, better initial margins, more
  compelling product and effective expense control all combined to create
  record earnings. The improvements in product led to higher full-price
  sell-through's and lower merchandise markdowns." (Defendant Hayne,
  ¶133)

6.     However, by the close of back-to-school season that September, Defendants could

no longer hide the true vulnerability of the Urban Outfitters brand as well as the Company as a

whole, which Defendants had known about since the beginning of the Class Period. On

September 9, 2013, after the market had closed, the Company filed its quarterly report on Form

10-Q for the second quarter of fiscal 2014. Therein the Company repeated its previously

announced second quarter financials but also revealed its slowed progress to date: "Thus far

during the third quarter of fiscal 2014, comparable Retail segment net sales are mid single-digit

positive." After posting near-double-digit gains throughout 2013, Urban Outfitters' sales growth

had fallen, much to the dismay of the market. Analysts were stunned, immediately fingering the

Urban Outfitters brand as the culprit behind the slowdown. The market would eventually learn

that the brand's merchandisers had missed the mark across the board: the entire product

assortment at the stores had been selling poorly.

7.     As a result of Defendants' revelation, Urban Outfitters' stock price immediately

plummeted *more than 10%*, falling from a close of $42.71 on September 9, 2013 to a close of

$38.35 on September 10, 2013, causing millions in investor losses on unusually high trading

volume.

8.     Meanwhile, Defendants Hayne and Conforti lined their pockets with proceeds of

*over $51 million* from insider stock sales during the Class Period while Urban Outfitters' stock

4

price remained artificially inflated as a result of Defendants' fraud. Significantly, neither Defendant had sold any Urban Outfitters stock in the 18 months[1] preceding the Class Period.

## II.     JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b). Many of the false and misleading statements and omissions were made in or issued from this District. Urban Outfitters' principal executive offices are located at 5000 South Broad Street, Philadelphia, Pennsylvania 19112-1495, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

11.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.     Plaintiff

12.     Plaintiff was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 7, 2014 [Dkt. No. 9]. As shown in his certification filed with the Court on October 11, 2013 [Dkt. No. 1] and incorporated herein, Plaintiff purchased Urban Outfitters

---

[1]     A period representing three times the length of the Class Period.

common stock at artificially inflated prices during the Class Period and suffered an economic loss when true facts about the Company's weak product assortments and decelerating sales growth were disclosed, and the stock price resultantly declined.

### B. Defendants

13. Defendant Urban Outfitters is a Pennsylvania corporation with principal executive offices located in Philadelphia, Pennsylvania. Urban Outfitters is a specialty retail and wholesale company offering fashion apparel, accessories, and home goods under the Urban Outfitters, Anthropologie, Free People, Terrain, and BHLDN brands.

14. Defendant Hayne is, and at all relevant times was, co-founder, Chief Executive Officer ("CEO") and President of Urban Outfitters and Chairman of Urban Outfitters' Board of Directors. During the Class Period, while Urban Outfitters common stock was artificially inflated, Defendant Hayne sold over 1.2 million shares of his Urban Outfitters common stock for total insider trading proceeds of more than $50 million.

15. Defendant Conforti is, and at all relevant times was, Chief Financial Officer ("CFO") of Urban Outfitters. During the Class Period, while Urban Outfitters common stock was artificially inflated, Defendant Conforti sold 27,000 shares of his Urban Outfitters common stock for total insider trading proceeds of more than $1.1 million.

16. Defendant Marlow is, and at all relevant times was, CEO of the Urban Outfitters Group within the Company.

17. Defendants Hayne, Conforti, and Marlow are collectively referred to herein as the "Individual Defendants."

18. During and prior to the Class Period, the Individual Defendants, as senior executive officers of Urban Outfitters, were privy to confidential and proprietary information concerning Urban Outfitters, its operations, finances, financial condition, and present and future

business prospects. The Individual Defendants also had access to material adverse non-public information concerning Urban Outfitters' product assortments and sales trends, as discussed in detail below. Because of their positions with Urban Outfitters, the Individual Defendants had access to non-public information about Urban Outfitters' business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Urban Outfitters' business.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with Urban Outfitters, each of the Individual Defendants had access to the adverse undisclosed information about Urban Outfitters' business prospects, financial condition, and performance as particularized herein, and knew, or recklessly

disregarded, that these adverse facts rendered the positive representations made by or about Urban Outfitters and its business issued or adopted by the Company materially false and misleading.

21. The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

22. Each of the above officers of Urban Outfitters, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein. These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

23. As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange

Act, and was, and is, traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Urban Outfitters' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Urban Outfitters' securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Urban Outfitters' publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's business prospects and the intrinsic value of Urban Outfitters common stock, causing Plaintiff and other members of the Class to purchase Urban Outfitters common stock at artificially inflated prices.

25.     Defendants are liable for: (i) making false and misleading statements; and/or (ii) failing to disclose adverse facts known to them about Urban Outfitters. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Urban Outfitters common stock was a success, as it: (i) deceived the investing public regarding the Company's business prospects; (ii) artificially inflated the price of Urban Outfitters common stock; and (iii) caused Plaintiff and other members of the Class to purchase Urban Outfitters common stock at artificially inflated prices.

9

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Confidential Witnesses

26.   Plaintiff's allegations herein concerning Defendants' materially false and misleading statements and omissions and Defendants' scienter are based upon, in part, interviews with numerous witnesses, including former employees of Urban Outfitters and other industry participants. These witnesses provided information regarding the various methods employed by Defendants in furtherance of their scheme to defraud Urban Outfitters' shareholders. These witnesses[2] included:

(a)   The former Princeton Store Manager, who was employed with Urban Outfitters off and on from 2004 until December 2013 in various roles, with his most recent stint being store manager for Urban Outfitter's Princeton, New Jersey location from December 2012 until his departure in December 2013.   While at the Princeton store, this former employee reported to District Manager Charles Scirbona, and was responsible for managing the day-to-day operations of the store, which included: hiring and managing personnel, performance reviews, managing the store budget, driving sales, meeting sales goals, partnering with the store merchandiser on design decisions, and generally managing the store environment;

(b)   The former Greenwich Village Store Manager, who was employed with Urban Outfitters from January 2013 until September 2013.   This former employee reported to District Manager Sandra Martinez, and was responsible for managing the Urban Outfitters store located in West Greenwich Village in New York, New York;

(c)   The former Milwaukee Store Manager, who was employed with Urban Outfitters from February 2010 until February 2013.   This former employee reported to District

---

[2]   All confidential witnesses are identified in the masculine to protect their identities.

Manager Laura Eason, and was responsible for managing the Urban Outfitters store located in Milwaukee, Wisconsin;

(d)     The former East Village Merchandising Team Lead, who was employed with Urban Outfitters in various roles from August 2011 until September 2013. He began as a sales associate in Chicago and was transferred in November 2012 to the Urban Outfitters store located in the East Village in New York, New York, where he ultimately was promoted to Merchandising Team Lead. This former employee reported to store manager Amy Tolley and store merchandiser Erin Rountree, and was responsible for reviewing forecast-to-actual sales variances and strategizing how to improve sales in given areas. Each morning he reviewed sales numbers, compared prior year/quarter/month/day sales figures, then met with staff to review these sales figures and decide which items to focus their sales efforts on;

(e)     The former Melrose Men's Department Manager, who was employed by Urban Outfitters from July 2011 until January 2014, with the majority of his time spent at an Urban Outfitters location on Melrose Avenue in Los Angeles, California (though he also spent three months at a store in Santa Monica, California). He reported to Melrose store manager Michelle Mente; and

(f)     The former Merchandise Manager, who was employed by Urban Outfitters from March 2012 until April 2013 at the Company's corporate headquarters in Philadelphia. He specialized in women's knits and intimates and reported to Divisional Merchandise Planner Jennifer Massela. As a merchandise manager for women's knits and intimates, this former employee forecasted sales for the above departments and interfaced with the departments' buyers to determine the type and amount of products to procure in order to maintain desired/anticipated inventory turnover.

**B.      Background of the Company and Its Brands**

27.      Urban Outfitters is a "leading lifestyle specialty retail company that operates under the Urban Outfitters, Anthropologie, Free People, Terrain and BHLDN brands."[3] Having opened its first store in Philadelphia in 1970, the Company now operates 500 retail stores worldwide, under five distinct brands, offering "highly differentiated collections of fashion apparel, accessories and home goods in inviting and dynamic store settings." As of January 31, 2013, Urban Outfitters employed approximately 20,600 people.

28.      The Company reports its business in two segments: retail and wholesale. The retail segment consists of all five Company brands, whose merchandise is sold directly to customers by way of those brands' retail stores, websites, and catalogs. The wholesale segment is limited to one brand, Free People, which develops young women's casual apparel to market to department stores and specialty retailers worldwide. The retail segment was responsible for approximately 95% of the Company's fiscal 2013[4] consolidated net sales, with the remaining 5% deriving from the wholesale segment. Within the retail segment, Urban Outfitters' retail stores contributed 71% of the Company's fiscal 2013 sales, while direct-to-consumer sales via brand-specific catalogs and websites accounted for nearly 24% of fiscal 2013 consolidated net sales.

29.      The Company strives to offer unique shopping experiences at stores typically located in enclosed shopping malls, specialty retail centers, and upscale street locations:

---

[3]      Background information provided herein derives from the Company's most recent Form 10-K, filed with the SEC on April 1, 2013 for the fiscal year ended January 31, 2013, and most recent Form 10-Q, filed with the SEC on December 10, 2013 for the third quarter of fiscal 2014.

[4]      Urban Outfitters' fiscal year ends January 31 of that year. Thus, the Company's fiscal year 2013 ran February 1, 2012 through January 31, 2013; the first quarter of fiscal 2013 ended April 30, 2012; the second quarter of fiscal 2013 ended July 31, 2012; and the third quarter of fiscal 2013 ended October 31, 2012.

We create a unified environment in our stores that establishes an emotional bond with the customer. Every element of the environment is tailored to the aesthetic preferences of our target customers. Through creative design, much of the existing retail space is modified to incorporate a mosaic of fixtures, finishes and revealed architectural details. In our stores, merchandise is integrated into a variety of creative vignettes and displays designed to offer our customers an entire look at a distinct lifestyle. This dynamic visual merchandising and display technique provides the connection among the store design, the merchandise and the customer. Essential components of the ambiance of each store may include playing music that appeals to our target customers, using unique signage and employing a staff that understands and identifies with the target customer.

30. The Urban Outfitters namesake brand targets "culturally sophisticated, self-expressive" young adults aged 18 to 28 with a mix of men's and women's fashion apparel, footwear, accessories, and apartment wares and gifts such as rugs, pillows, shower curtains, books, candles, and novelties. Its demographic is the college market. When describing Urban Outfitters' customers at a meeting with analysts in September 2012, one of the Company's creative directors opined, "That's the easiest way to say what 'it' is. It is the incoming freshman, the struggling art school kid, the girl who dresses differently than her friends. The kid who has a band, anybody who has a band is our customer. I'm dead straight on that. And the girl who has not realized that quirky is sexy and that being a hipster is not simply a marketing tool, it's someone that just does something differently than others." At that same conference, Defendant Hayne described "the Urban customer" as "the upscale homeless person, who has a slight degree of angst and is probably in the life stage of 18 to 26."

31. As of October 31, 2013, the Company operated 225 Urban Outfitters stores across North America and Europe; its fiscal year 2014 plans called for the opening of 15 new stores. The Urban Outfitters brand stores, some of which are located in unconventional retail spaces such as a former movie theater, a bank, and stock exchange, contributed about 36% of the Company's consolidated net sales for fiscal 2013. As of October 31, 2013, the total Urban

Outfitters retail segment (store sales combined with direct-to-consumer sales) accounted for 44.5% of fiscal 2014 consolidated net sales.

32.     The Anthropologie brand "tailors its merchandise and inviting store environment to sophisticated and contemporary women aged 28 to 45." The "eclectic" product assortment offered at Anthropologie stores includes women's casual apparel and accessories, shoes, home furnishings ranging from furniture to lighting to bedding, and an array of gifts and decorative items. As compared to "the Urban customer," Defendant Hayne sees the target Anthropologie audience as "a bit more polished," and older, with less angst. "She tends to be a homeowner and she tends to be in a relationship and more likely than not, married with children." Another Urban Outfitters executive once described the Anthropologie customer as "the customer you want to have at a dinner table. She's an optimist. She's aware of what's going on in the world, but she chooses to focus on the positives, not the negatives."

33.     The Company ran 185 Anthropologie stores in North America and Europe as of October 31, 2013; its fiscal year 2014 plans called for the opening of 8 new stores. Anthropologie stores accounted for about 30% of the Company's consolidated net sales for fiscal 2013. As of October 31, 2013, the total Anthropologie retail segment (store sales combined with direct-to-consumer sales) comprised 40.8% of fiscal 2014 consolidated net sales.

34.     Urban Outfitters' Free People brand differs from the Company's other four brands in that Free People operates retail stores as well as its own wholesale division. The retail stores primarily offer Free People-branded merchandise such as casual women's apparel, intimates, shoes, accessories, and gifts. That merchandise is targeted to young contemporary women aged 25 to 30. As compared to Urban Outfitters and Anthropologie retail locations, Free People stores tend to be much smaller in both square footage and product offerings, resulting in comparatively

14

lower sales figures. But the Wholesale segment also sells Free People-branded merchandise to approximately 1,400 department stores and other specialty retailers worldwide, including Macy's, Nordstrom, Bloomingdale's, and Lord & Taylor, further boosting the brand's overall visibility and sales.

35.     As of October 31, 2013, the Company operated 86 Free People retail stores in North America; its fiscal year 2014 plans called for the opening of 13 new stores. Free People stores comprised approximately 3% of Urban Outfitters' consolidated net sales for fiscal 2013, and, as mentioned above, the brand's wholesale dealings added another 5% of the Company's 2013 consolidated net sales. As of October 31, 2013, the total Free People retail segment (store sales combined with direct-to-consumer sales) accounted for 7.5% of fiscal 2014 consolidated net sales, while wholesale dealings contributed another 6% of consolidated net sales for the year.

36.     Urban Outfitters' two other brands, Terrain and BHLDN – the former offering outdoor living and gardening products; the latter specializing in all things weddings (bridal gowns, party dresses, jewelry, footwear, lingerie, and decorations) – each accounted for less than 1% of the Company's 2013 consolidated net sales. As of October 31, 2013, each brand operated just two stores and accounted for less than 1% of fiscal 2014 consolidated net sales.

### C.     "Comparable" Sales Growth Is a Key Metric in the Retail Industry

37.     Urban Outfitters achieved record sales of $2.79 billion in fiscal 2013, a 13% increase over fiscal 2012 sales of $2.47 billion. Of the $321 million gain in net sales in fiscal 2013, $305 million was attributable to the Retail segment and $16 million stemmed from growth in the Company's Wholesale operations.

38.     Of particular note for fiscal 2013 was the Company's comparable retail segment net sales growth of 7%. Comparable retail segment sales are the sum of Urban Outfitters' comparable *store* sales plus comparable *direct-to-consumer* (e.g., catalog and website) sales. To

15

be considered "comparable," a store or direct-to-consumer channel must have been open and operational for at least one full fiscal year, although a store that was materially expanded or remodeled within that year (or otherwise not operating at its full capacity) would not qualify. Sales from stores and direct-to-consumer channels that do not fall within the foregoing definition are considered to be "non-comparable," as are the effects of foreign currency translation.

39. According to Retail Metrics, Inc., a consulting firm founded "to provide the institutional investment community with independent research on the retail industry" and regularly cited by analysts following Urban Outfitters stock, comparable sales (or "same-store sales") are "a key metric for gauging a retailer's underlying health and organic growth, factoring out growth through acquisition or new store openings." Based on extensive feedback from buy-side and sell-side retailer traders, as well as publicly traded retailers themselves, Retail Metrics has concluded that "retail stocks tend to trade on same store sales performance more than any other metric."[5]

40. Investopedia adds, "Same-store analysis is important because although new stores may represent growth for a retail chain, a saturation point – where future sales growth is determined by same store sales growth – may eventually occur. Same-store sales are typically published by retail companies on a monthly basis. The figures help analysts differentiate between revenue growth that comes from any new outlets and growth that is a result of improved management and operations at the existing outlets."[6]

---

[5] *See* "About Retail Metrics," available at http://www.retailmetrics.net/corp.asp (last visited March 3, 2014).

[6] *See* "Investopedia explains 'Same-Store Sales,'" available at http://www.investopedia.com/terms/s/samestoresales.asp (last visited March 3,2014).

41.     Wikinvest points out: "Analysts and investors prefer rising same store sales each month as this indicates that compared to the prior month

> 1. Store traffic is increasing and/or

> 2. Shoppers are willing to pay more for products

These two factors increase sales revenues without opening new stores, which is often a more capital-intensive way of growing."[7]

42.     In short, comparable sales (often shorthanded "comps") are meant to capture the most accurate picture of a retailer's core health by excluding any sales growth attributable to new store openings or other forms of expansion. It thus is not surprising that Urban Outfitters' comparable retail sales growth is routinely the focus of analyst reports discussing the Company's stock. For example:

(a)     Morgan Stanley's May 20, 2013 report entitled "Quick Comment: Solid 1Q Shows Thesis on Track" begins, "URBN is a top retail growth story: URBN's 9% 1Q comp result is one of Retail's best and in our view signals ongoing online momentum and Anthropologie revitalization, two key stock themes."

(b)     Janney Capital Markets issued a report on May 21, 2013 entitled "Adding to Janney Best Ideas List; QTD Comps Running +9%."

(c)     On August 19, 2013, RBC Capital Markets published a report entitled "Differentiated Product Gives You Differentiated Comps."

(d)     The Company's comparable retail sales growth likewise was the centerpiece of Janney Capital Markets' August 20, 2013 report entitled "2Q13 Solid Beat and +9% Comp; QTD 3Q13 Comp Running Similar to 2Q13."

---

[7] See "Same store sales," available at http://www.wikinvest.com/wiki/Same_store_sales (last visited March 3, 2014).

(e)     KeyBanc Capital Markets opened its August 20 report with the following: "Urban Outfitters, Inc. continues to successfully turn its Anthropologie business (9% comp), while sustaining very strong results at Free People (38% comp)."

**D.     Leading Up to the Class Period, the Urban Outfitters Brand Achieved Steadily Accelerating Retail Sales Growth**

43.     Comparable retail sales for the Company grew steadily in the five quarters leading up to the Class Period, reaching growth of 11% by the end of fiscal 2013:

| QUARTER | COMPANY GROWTH |
|---|---|
| Fourth Quarter 2012 (ending Jan. 31, 2012) | Up 2% |
| First Quarter 2013 (ending Apr. 30, 2012) | Up 2% |
| Second Quarter 2013 (ending Jul. 31, 2012) | Up 4% |
| Third Quarter 2013 (ending Oct. 31, 2012) | Up 8% |
| Fourth Quarter 2013 (ending Jan. 31, 2013) | Up 11% |

44.     This success was attributed to Urban Outfitters' strong management and well-executed product assortment across its three primary brands. Throughout the Class Period, RBC Capital Markets highlighted the "differentiation" and product assortments that set URBN apart. Reports issued May 17, May 21, and August 19, 2013 all concluded:

We believe shares of URBN will outperform the peer group for the following reasons:

- Uniqueness and differentiation. Despite the current difficult consumer environment, performance at URBN has been strong. We believe this relates directly to the novelty and differentiation offered across the company's assortments, brands, and concepts.

- Design culture. The company operates a design culture that is not based on "playing it safe," but rather on taking fashion risks even in the current environment. We believe this culture has contributed to the novelty and differentiation that directly relate to the company's strong performance.

45.     Many more analysts praised the Company as a standout among its peers, with strong sales momentum from 2012 expected to continue well into 2013. Morgan Stanley's January 10, 2013 holiday retail roundup labeled Urban Outfitters "the clear winner" in its

segment. The report, entitled "URBN a Holiday Highlight," placed the Company's 2012 "record Holiday sales" performance squarely ahead of rival mall retailers Aeropostale, American Eagle Outfitters, and Abercrombie & Fitch.

46.    Janney Capital Markets issued its own review on January 10, under the heading "Strong Holiday Comp at All Divisions; Still a Top Pick into 2013." The report noted, "On January 10, 2013, before market open, URBN reported a strong holiday (November/December combined) comparable retail segment net sales (including DTC) of +9% versus +5.9% *Retail Metrics* 4Q12 consensus. We had been looking for comp upside to the Street estimate based on strong quarter-to-date channel checks, including promotional levels better than last year at both Urban Outfitters and Anthropologie, as well as strong traffic and conversion reads during both critical time periods of Black Friday and Christmas. Still, the strength of the holiday comp was an upside surprise, especially given the more challenging 2H December comp compares, suggesting that all divisions of URBN resonated with their customer base."

47.    J.P. Morgan added on January 14: "URBN's holiday strength further served to illustrate the company's ongoing turnaround progress, even in the face of difficult promotionally driven compares from last year. We continue to believe in the longer term growth opportunities with an emphasis on the ongoing margin opportunity through improving markdown rates, structural benefits from the omni-channel push and ultimately expense leverage. As such, we continue to expect that with inventory under control and management focused on improving product offerings, URBN represents an attractive growth opportunity with significant runway for both top and bottom line growth and we reiterate it as our best idea for 2013."

48.    Wells Fargo Securities noted on February 8, 2013 that URBN's "Comp Momentum Seems Here to Stay," and accordingly raised its earnings and valuation estimates.

49. By the start of the Class Period, analysts were predicting sustained double-digit sales growth through 2013:

- Oppenheimer's March 11, 2013 report summarized: "URBN sets up well for 2013. 4Q results that the company reported Monday night were in line with consensus after adjusting for a higher tax rate. The turnaround at the chain remains fluid, and importantly, QTD sales are trending in line with 4Q strength. 2013 guidance calling for gross margin improvement of at least 50 bps appears reasonable and could prove conservative if full-priced selling momentum continues."

- According to Credit Suisse's March 12, 2013 report: "Urban Outfitters reported solid 4Q earnings results last night, which provides support for our thesis that the company can sustain double-digit sales and high-teens earnings growth, driven by: 1) A rebound in store productivity and merchandise margin; and 2) Benefits from extension of the company's eCommerce leadership. While our FY13 estimates are lowered modestly on higher than previously anticipated SG&A spending ramp, we continue to see upside potential to estimates and reiterate our Outperform rating."

- Telsey Advisory Group highlighted "2013 off to a solid start" in its March 12 report entitled "Urban Outfitters, Inc. Reports strong 4Q12 results with the momentum extending into 1Q13; 2013 should mark another key year in URBN's evolution."

50. Significantly, the Urban Outfitters brand enjoyed similar success throughout 2012, boosting comparable retail sales growth from 3% to 11% in just one calendar year:

| QUARTER | BRAND GROWTH |
|---|---|
| Fourth Quarter 2012 (ending Jan. 31, 2012) | Up 3% |
| First Quarter 2013 (ending Apr. 30, 2012) | Up 6% |
| Second Quarter 2013 (ending Jul. 31, 2012) | Up 6% |
| Third Quarter 2013 (ending Oct. 31, 2012) | Up 7% |
| Fourth Quarter 2013 (ending Jan. 31, 2013) | Up 11% |

51. Growth at the Urban brand is critical to the Company's success: its 225+ stores represented 36% of consolidated net sales for fiscal 2013 – the highest percentage of any single segment of Urban Outfitters' business. Moreover, as of October 31, 2013, the Urban brand's

retail segment contributed 44.5% of fiscal 2014's consolidated net sales. Thus, the Urban Outfitters brand is the largest and most lucrative of the Company's five brands.

52. BMO Capital Markets' February 15, 2013 report identified the Urban brand's momentum as the key driver behind the Company's growth:

> Until now our Outperform rating was premised on 1) building momentum at the Urban division while the turnaround at Anthropologie gained traction; 2) capitalizing on easy comparisons, while reining in excessive inventory levels and promotions to drive a margin rebound; and 3) compelling valuation as new leadership at both the CEO and division head levels coalesced. Over the course of 2012, we've seen these factors largely come to fruition, though it's been a tale of two cities. On the one hand, the core Urban brand has clearly recovered nicely, hitting the sweet spot of trends to reconnect with its core customer, and we expect that momentum to continue. On the other hand, we thought we'd see clearer signs of traction at Anthropologie by this point, as we get our early reads on the spring season. The division has indeed made improvement with respect to product and pricing for spring, but overall remains a work in progress.

In a follow-up report published March 12, 2013, BMO Capital Markets reiterated, "The core Urban brand continues to make nice progress, capitalizing on what we view as a very favorable trend cycle with respect to its core customer. We expect that momentum to continue in 2013."

53. Also on March 12, Jefferies issued a report on the "Urban Brand Leading the Way." Of note, "The Urban Outfitters brand continued to see improving topline and margin trends in 4Q. These gains have been driven by the company's focus on providing more compelling, trend right product and more effective marketing campaigns. We find it encouraging that all categories posted positive comps with women's apparel strongest. Looking forward, management sees room for further progress around improving full price selling and bringing promos more in line with historical levels."

### E. In a Grim Teen Retail Market, Urban Outfitters Was Praised as the Lone Bright Spot for Its Spot-On Product Assortments

54. The success of the Urban Outfitters brand helped propel the Company to the top of the teen retail market leading up to and during the Class Period. As Morgan Stanley aptly

noted on August 20, 2013, Defendants were offering "Sunny URBN Skies Amidst Stormy Retail Clouds."

55.     The teen retail market in general had fizzled during the 2012 holiday season and fared no better during the first half of 2013. The following chart shows competitors' struggles during this time period:

| QUARTER | AEROPOSTALE COMPS | ABERCROMBIE & FITCH COMPS | AMERICAN EAGLE COMPS |
|---|---|---|---|
| Fourth Quarter 2012 | Down 9% | Flat | Up 4% |
| First Quarter 2013 | Down 14% | Down 15% | Down 5% |
| Second Quarter 2013 | Down 15% | Down 10% | Down 7% |
| Third Quarter 2013 | Down 15% | Down 14% | Down 5% |

56.     Analysts cited a confluence of economic and environmental factors making for a "very challenging" teen retail market during this time: (i) fiscal cliff concerns, as well as the effects of Hurricane Sandy in the northeast, discouraged shopping during the fall of 2012; (ii) the 2% increase in payroll taxes further discouraged holiday shopping; (iii) cold, wintry weather dampened store foot traffic and delayed spring/summer shopping in the first quarter of 2013, particularly on the east coast; (iv) the lack of any "must-have" fashion trends contributed to softer customer demand (2012 had been the year of colored denim, which boosted sales industry-wide); and (v) heavier markdowns and promotional activity resulting from softer demand compressed retailers' profit margins.

57.     And beyond these factors, clearly teen retailers' assortments were generally missing the mark in attracting and satisfying their target audience. As shown in the above table, comparable sales were shrinking across the board during the Class Period.

58.     Urban Outfitters, on the other hand, seemed to be bucking the trend, delivering ostensibly strong comparable sales growth at levels well above the competition:

| QUARTER | COMPANY COMPS | COMPETITOR AVERAGE |
|---|---|---|
| Fourth Quarter Fiscal 2013 | Up 11% | Down 1.66% |
| First Quarter Fiscal 2014 | Up 9% | Down 11.33% |
| Second Quarter Fiscal 2014 | Up 9% | Down 10.66% |
| Third Quarter Fiscal 2014 | Up 7% | Down 11.33% |

59.    Defendants were not shy in touting their continued success amidst this otherwise difficult market environment:

- March 11: "We were concerned when we entered the year, given the weather that existed last year in the month of March. And so far, we are pleasantly surprised with how well the business is holding up, even though here on the East Coast, the weather is significantly less favorable to early purchases." (Defendant Hayne, ¶99)

- April 4: "So overall, I am feeling through what I am seeing out of warmer climate markets as well as what I have seen in the performance of direct; I am feeling good about our fashion content. I think that there is some change -- pronounced change -- going on in trending categories; and I think our team has done a good job of offsetting some volume risk with distorting other categories into the emergence of some new categories to perform. So, I'm feeling pretty good about it overall. I wouldn't say it's a robust market out there, but I am feeling good about our chances." (Defendant Marlow, ¶112)

- May 20: "In regard to the overall content of the mix, we had good performance out of the fashion businesses in North America and in Europe. The weather was not necessarily our best friend in North America in the Northeast, as it pertains to some of our offer. But we felt good about how we look. We feel good about how we look going into second quarter, and it's a moment of change in the mix in regard to what we're seeing in silhouette performance. And I think that our team's got a good -- done a good job of identifying that and fueling our inventory with appropriate product." (Defendant Marlow, ¶120)

- August 19: "Well, the business we saw in July essentially mirrored what we saw for the entire quarter. So the strength of the brands that you saw in the comps that Frank gave are the basically the strength that we saw in July. And I don't think there's anything that was special about July. I think we had a number of situations where our product offering was, I would say, much improved over the prior year, and I think that that was the primary driver of the comp sales." (Defendant Conforti, ¶135)

60.     Not surprisingly, analysts universally applauded Urban Outfitters' runaway success from the fourth quarter of fiscal 2013 through the first two quarters of fiscal 2014. Analysts at BMO Capital Markets hosted a dinner with Defendants Hayne and Conforti following a conference in Miami in January 2013. After lengthy discussion on URBN's upcoming short- and long-term initiatives, the analysts came away with even "higher confidence" in the Company's prospects, and in the Urban brand in particular: "As it relates to the Urban brand, the division has opportunity to increase the penetration of in-house design and focus more on 'own' brands versus private label product. Management talked about distorting toward trending categories, such as women's knits, shoes, and accessories, while in the process expanding web exclusive product. With respect to the direct business, management plans to continue broadening its global product. We see opportunity in this growing segment, even on top of double growth last year in North America and Europe."

61.     Wedbush Equity Research published its own report on February 7, 2013 forecasting continued sales momentum based on the Company's spring assortments and "clean" inventory levels: "Following inventory and product issues [last year], the company has been able to successfully reduce promotions [this year], leading to improvements to regular price sales. We believe Anthro has seen the largest margin benefit followed by UO then FP. Moreover, we note positive early checks on the Spring assortment and generally clean inventory levels (expected to be inline with sales trends) should bode well for sustained sales momentum."

62.     As the year kicked off, the Company's strong assortments for fiscal 2014 earned praise from a number of other analysts:

(a)     RBC Capital Markets on March 8: "We continue to believe the fashion at URBN is unique and stands out from the crowd at all three concepts. We highlighted some

24

standout products when the first spring product hit stores (in our Spring Fashion Preview dated 1/31), and we've been tracking how the assortments have been progressing throughout the month. At Urban, the product has been getting increasingly more warm-weather oriented with new cut-out dresses, lace eyelet tops and denim shorts. At Free People, spring makes a pronounced appearance through ombre shawls, mesh skirts and detailed sandals. Anthropologie is getting into the spring mood with their vibrant patterned tops, multiple lengths of dresses and vintage-like Maillot bathing suits. While the winter weather is likely not helping sales right now, we believe the assortments across the division will meet with good customer response as the weather warms."

(b)　　Janney Capital Markets on March 12: "We believe Anthropologie's product is clearly resonating with its core customer again, as URBN pointed out that they have seen some momentum gain there QTD, as well as strong performances from Free People and Urban Outfitters, which remain consistent with our channel checks. We believe the trends for spring are squarely in URBN's sweet spot and believe all three divisions should benefit from the fashion newness in spring. We continue to remain confident that the turn in the business will continue throughout FY13 and will be driven by: 1) leadership changes that will continue to positively impact the business, 2) a focus on inventory discipline, and 3) improved merchandising at both UO and Anthropologie."

(c)　　PiperJaffray on April 1: "We believe the strong sales are indicative of market share gains and a merchandise assortment that is resonating with the consumer, particularly given that several retailers have commented that business in March has been negatively impacted by unseasonably cool weather."

(d)     Janney Capital Markets on April 2: "We continue to remain confident that the turn in business is on track for 2013 and will be driven by 1) a focus on inventory discipline and 2) improved merchandising at both Urban Outfitters and Anthropologie. We reiterate our BUY rating and recommend accumulation of URBN shares, as we believe the story is setting up nicely to continue to comp positively and expand margins in 2013."

63.     Following robust first quarter 2014 comparable sales growth, RBC Capital Markets highlighted on May 21, 2013: "Despite weather which was not helpful in 1Q, URBN delivered comparable retail segment growth of 9%, gross margin improvement of 120 basis points, and EPS growth of 36%. We believe this speaks to the unique nature of the URBN concepts and the differentiation provided by the assortments."

64.     Further, the Company's carefully selected product assortments again were the centerpiece of analysts' praise for continued second quarter 2014 growth:

(a)     RBC Capital Markets on August 19 (in a report entitled "Differentiated Product Gives You Differentiated Comps"): "URBN did not seem to experience the weak traffic and aggressive promotions that have been rampant among other retailers we have heard from so far in 2Q." "2Q at URBN looks different than 2Q elsewhere. Comps of +9% came in at the high-end of our +7-9% expected range. We believe they were able to achieve this through continuing to offer compelling and unique product across all three of their concepts." "URBN appears to be one of the few entering Fall 2013 with strong momentum."

(b)     Macquarie (USA) Equities Research on August 19: "URBN turned in a stellar quarter with sales that slightly topped high expectations and margins that beat. The company has proven once again that it doesn't really operate in the same competitive dynamic as

26

the rest of the mall. When URBN's product is right, it's selling no matter the backdrop. The company saw strength across the quarter at all three brands."

(c)     Morgan Stanley on August 20, 2013: "Very solid +9% 2Q comp growth despite softening traffic trends across retail: We think 2Q sales outperformance vs. peers demonstrates outstanding management execution."

(d)     Jefferies on August 20: "Both the Urban Outfitters and Anthropologie brands saw improving topline trends in 2Q. These gains have been driven by the company's focus on providing more compelling, trend right product and more effective marketing campaigns."

65.     Thus, from the outset of the Class Period until Defendants' ultimate revelation, investors were led to believe that, through strong merchandising and product assortments, Urban Outfitters had successfully navigated the troubled teen retail waters to maintain solid comparable sales growth while the rest of the industry foundered.

**F.     The Urban Outfitters Brand Had Begun to Slip in the First Quarter of Fiscal 2014, but Growth at Anthropologie and Free People Buoyed the Company**

66.     However, within the Urban Outfitters brand, a different story was unfolding. Comparable retail sales growth had started off strongly but precipitously deteriorated during the course of the Class Period:

| QUARTER | BRAND COMPS |
|---|---|
| Fourth Quarter Fiscal 2013 | Up 11% |
| First Quarter Fiscal 2014 | Up 6% |
| Second Quarter Fiscal 2014 | Up 5% |
| Third Quarter Fiscal 2014[8] | Down 1% |

---

[8]     Urban Outfitters announced its third quarter 2014 results on November 18, 2013, after the close of the Class Period.

67.     With a target audience between the ages of 18 and 28, the Urban brand was most susceptible to the general industry headwinds facing the teen retail market; Anthropologie and Free People customers skewed older, providing insulation from some of the market forces at work during the Class Period. Significantly, Urban's declining growth rates laid bare a vulnerability to toughening market conditions to which the brand previously had been assumed immune. This assumption was due in no small part to Defendants' misrepresentations and omissions during the Class Period.

68.     Numerous former insiders from Urban Outfitters stores around the country reported weakening sales and increased promotional activity leading up to and during the Class Period. Employees at all Urban Outfitters stores had daily access to other stores' sales figures via the Company's Intranet, including stores within URBN's other brands. There was even an "URBN Sales Page" on the Intranet that showed Urban Outfitters' total North American sales, incorporating both store sales and direct-to-consumer sales.

69.     Sales at New York City's East Village location plummeted from January 2013 to March 2013, just before the start of the Class Period. By the end of the Class Period, in September, the East Village store still was not hitting its sales targets. The same was true for the West Greenwich Village store during the first nine months of 2013. In fact, comparable sales were poor throughout the entire New York City district in 2013. And the Princeton, New Jersey store fared no better throughout that year.

70.     On the west coast, sales had been strong from 2011 to 2012 at the brand's Melrose Avenue store in Los Angeles, but then late in 2012, the store began missing sales targets. By 2013, its sales were completely below the mark, and most of the time during that year the Melrose store was not hitting its projected sales. There was a constant overflow of

inventory yielding an overstocked storage room, with products stacked in front of shelves in a walkway in the storeroom.

71.     To compensate for sales shortfalls, store managers were expected to cut payroll and reduce staff hours to balance their monthly financial plans. They constantly faced a choice between the lesser of two evils – missing their monthly financial plan or running the store less effectively with fewer staff.

72.     With sales generally down in 2013, Urban Outfitters had no choice but to increase its promotional activity. Many former insiders confirmed that markdowns and other promotional activities were set at corporate headquarters and then disseminated throughout the store base. One former store manager recalled heavy markdowns in 2013, particularly in the all-important women's department. Among the indications he noted of the heavy markdown season in 2013: his store frequently could not fit all of the sale items onto the sales racks, and sales frequently were extended beyond their initially-stated period (for example, a three-day sale would be stretched through the whole week). Elsewhere, there were elevated inventory levels heading into 2013, precipitating the increase in markdowns; the pressure to sell also increased going into 2013, with planned sales suddenly being moved up three days earlier or extended longer on the back-end. Former store managers recalled an overall feeling of desperation at their stores, with customers coming to *expect* sales and therefore deferring purchases until the items went on markdown.

73.     To be sure, beginning in 2013, the Company's weekly newsletter "The Slant" showed increased weekly storewide promotions, markdowns, and sales events for stores to follow. This newsletter was disseminated through the Company's Intranet to provide promotional instructions to all of Urban Outfitters' stores. To one former store manager in

particular, the heightened levels of markdowns felt like a change in corporate culture compared to the Urban Outfitters he had known for so many years. In the past, the Company had avoided being known for sales or having racks in front of its stores. By early 2013, email blasts to customers were commonplace offering various promotions such as 30% off with college I.D.

74.     In the meantime, while the Urban brand experienced *decelerating* comparable retail sales growth during the first half of fiscal 2014, both Anthropologie and Free People enjoyed gangbusters growth. To be sure, Anthropologie's growth climbed steadily upward during the Class Period, and Free People maintained astonishingly high growth levels in excess of 30%:

| QUARTER | ANTHRO COMPS | FREE PEOPLE COMPS |
| --- | --- | --- |
| Fourth Quarter Fiscal 2013 | Up 7% | Up 37% |
| First Quarter Fiscal 2014 | Up 8% | Up 44% |
| Second Quarter Fiscal 2014 | Up 9% | Up 38% |
| Third Quarter Fiscal 2014 | Up 13% | Up 30% |

75.     Indeed, the continued success of Anthropologie and Free People masked the true state of affairs at the Urban Outfitters brand, while buoying the Company more generally to maintain Defendants' façade. In reality, the Urban brand's product assortment for fiscal 2014 had missed the mark entirely, causing sales to lag and prompting the need for heavy promotions to clear inventory. As Defendant Conforti would later admit, the Urban assortment had fallen flat "across all divisions . . . it is not a specific class, men's, women's, WAC . . . I would say it is across the entire assortment."

76.     By September 2013, analysts took note of the brand's 30% Labor Day weekend markdown during the important back-to-school season, a promotion successfully avoided the year prior. The promotional pressures facing the teen retail market generally, and now the Urban

30

Outfitters brand as well, were clear. Contrary to Defendants' representations and prevailing market wisdom, Urban had not escaped fiscal 2014's retail woes.

77. When the market was stunned to learn on September 9, 2013 that the Company's third quarter 2014 comparable retail sales growth was tracking only "mid single-digit positive" – as opposed to the double-digit and high single-digit growth experienced over the previous three quarters – the Urban Outfitters brand was immediately fingered as the problem. In its September 10 report, Janney Capital Markets quickly surmised "the entire issue for URBN's slowing sales stems from the UO division," adding, "we now believe the UO division has decelerated more than our initial projections." The next day, at the Goldman Sachs Global Retailing Conference, Defendant Conforti confirmed that the Urban brand was to blame, and also provided greater detail as to the brand's Class Period missteps:

- Execution issues were plaguing Urban "across all divisions" because "there [are] pockets of trends that are working very well and we are not distorted and in those enough"

- There was no "specific class" or "one certain category" on which Defendants were failing to deliver – rather, the problems were "across the entire assortment"

78. Offering hope for Urban's ability to fix its assortment issues, Defendant Conforti added, "Right now we think there are some very nice fashion trends that are out there and it is the opportunity for us to change and make sure that our assortment is appropriate and is what the consumer is looking for."

G. **Defendants Recognized, or Were Severely Reckless in Not Recognizing, the Company's Vulnerability During the Class Period Resulting from Product Assortment Failures**

79. However, the Urban brand's assortment misses did not suddenly appear during back-to-school season in late August/early September. Urban Outfitters had already finalized its

back-to-school procurements by April – at the beginning of the Class Period. Back-to-school price points were similarly set by that time, well in advance of the actual back-to-school season.

80.     As detailed above, sales at the Urban Outfitters brand had begun appreciably slowing by the start of 2013. Former employees from store locations around the country – including such major areas as New York City and Los Angeles, California – reported weakening sales trends and missed sales targets throughout the year. And such store-level sales information was readily accessible on a daily basis via the Company's Intranet, as confirmed by multiple former insiders. In fact, the "URBN Sales Page" on the Intranet showed Urban Outfitters' sales for the entire North American segment, including both store and direct-to-consumer sales.

81.     Markdowns and other promotional activity increased throughout the year as a result of weakening sales trends. These activities were set at the Company's corporate headquarters, then disseminated to the stores for implementation. In 2013, Urban Outfitters' weekly newsletter "The Slant" began showing increased weekly markdowns, storewide promotions, and other sales events for the stores to follow. The added markdowns and promotions were significant enough for one former store manager to note a change in corporate culture as compared to the Urban Outfitters of years past.

82.     Thus, former insiders have confirmed that sales data compilations and scheduled promotional activities emanated straight from the Company's corporate headquarters. This information was shared with thousands of store-level Urban Outfitters employees by way of the Company's Intranet. Defendants Hayne, Conforti, and Marlow would have had access to the same sales and promotional data readily available to store employees located as far away as New York, Wisconsin, and California. Indeed, the fiscal 2013 Form 10-K provides greater detail on the Company's sophisticated sales data compilation tools:

Very early in our growth, we recognized the need for high-quality information in order to manage merchandise planning, buying, inventory management and control functions. We invested in a retail software package that met our processing and reporting requirements. We utilize point-of-sale register systems connected by a digital subscriber line network to our home offices. Additionally, many of our stores have mobile point of sale devices which have virtually the same functionality as our cash registers. These systems provide for register efficiencies, timely customer checkout and instant back office access to register information, as well as daily updates of sales, inventory data and price changes.

83.     Yet, despite being fully informed as to the Urban brand's worrying sales trends and increased promotional activity, Defendants failed to disclose this to the market in an effort to protect the false perception that Urban Outfitters was out-executing its foundering teen retail competition. Instead, as further detailed below, Defendants misled the market as to the strength of the Urban brand's product assortment, the Company's continued sales momentum, and further opportunity for reduced markdowns and resultant margin improvement, stating, for example:

- "So overall, I am feeling through what I am seeing out of warmer climate markets as well as what I have seen in the performance of direct; I am feeling good about our fashion content [at the Urban Outfitters brand]" (Defendant Marlow, ¶112);

- "While the turnaround at Anthropologie certainly helped to drive Urban's record first quarter sales, Anthropologie was not alone. The Free People brand produced outstanding comp gains across all of their channels. In fact, all brands continue to build upon the successes established last year, and each posted record first quarter sales" (Defendant Hayne, ¶118);

- "There is no reason to believe that we couldn't see a continued decrease in markdowns" (Defendant Hayne, ¶95); and

- "We believe our gross margin growth opportunities will be primarily driven by lower mark down rates and higher initial margins resulting from improved product execution and continued focus on inventory management" (Defendant Conforti, ¶118).

These false and misleading statements and omissions caused the price of Urban Outfitters stock to be artificially inflated during the Class Period.

33

84.     Ultimately, the Company revealed that its comparable retail sales growth was much weaker than Defendants had led investors to believe because the Urban Outfitters brand was experiencing ***decelerating*** retail sales growth due to a poorly executed product assortment.

85.     Analysts were dismayed by Defendants' revelations, which stood in stark contrast to their previous disclosures, noting:

- "Urban Outfitters running a fever: Our talks with management indicated that Urban Outfitters (UO) may have suffered from fashion misses." (Wells Fargo Securities, September 9);

- "URBN 10-Q Update Disappointing, 3QTD Comp +MSD . . . The sales slowdown at the Urban division is clearly disappointing" (Morgan Stanley, September 9); and

- "We believe the entire issue for URBN's slowing sales stems from the UO division, which we believe showed material slowing at the end of August and MTD September. Over Labor Day weekend, the UO division ran an additional 30% off all clearance, which they did not run last year." (Janney Capital Markets, September 10).

86.     Defendants' revelations, coupled with the resulting analyst commentary, shocked the market, causing Urban Outfitters' stock price to decline ***more than 10%*** over the next trading day, causing millions in investor losses on unusually high trading volume. But while investors suffered, Defendants Hayne and Conforti capitalized on their fraud by executing conspicuously well-timed stock sales for more than ***$51 million*** in combined proceeds during the Class Period.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.     Fourth Quarter 2013

87.     The Class Period begins on March 12, 2013, the first day of trading following the Company's announcement of record sales and robust growth for the fourth-quarter and fiscal year 2013.

88.     On March 11, 2013, after the market closed, Urban Outfitters issued a press release detailing its fourth quarter and fiscal year 2013 financial results, which also was filed

34

with the SEC on Form 8-K on March 12, 2013. The Company reported net sales for the fourth quarter 2013 reached a record $857 million, a 17% increase over the same quarter the prior year. Comparable retail segment sales for the Company grew 11%, with the Urban Outfitters, Anthropologie, and Free People brands achieving comparable retail sales growth of 11%, 7%, and 37%, respectively.

89.     For fiscal 2013, total Company net sales jumped to a record $2.8 billion, a 13% increase over the prior year. Comparable retail segment sales grew 7% for the year. Gross profit rate improvements both for the quarter and for the fiscal year were attributed to "a reduction in merchandise markdowns across all brands."

90.     Urban Outfitters hosted a conference call with analysts the afternoon of March 11, 2013, with Defendants Hayne and Conforti opening the call with prepared remarks. Defendant Conforti recited Urban Outfitters' quarterly and annual financial achievements, and in reviewing a 650-basis point improvement to the Company's gross profit rate for the quarter, noted, "The increase in gross profit rate was primarily due to a reduction in merchandise markdowns across all brands." Defendant Hayne added, "In the fourth quarter, margin improvement was even more pronounced. Both gross and operating margins improved by more than 650 basis points. Better product execution in each of our three larger plans resulted in an 18% increase in regular price comp sales, while better sell-throughs and better inventory management resulted in a significant decrease in markdown comp sales." He continued, "While we are pleased with this progress, we are not satisfied. We believe there is room to further improve our IMU and decrease our markdown rate. Boosting gross margins by at least 50 basis points is one of our goals."

91.     On the subject of brand leadership and opportunities for growth, Defendant Hayne gushed, "Strong brand leadership, highly talented and motivated brand teams and a shared

service group second to none – this is why I am confident that our brands will continue to resonate with their customers across all channels and that Urban will remain a premier consumer lifestyle company."

92. Looking ahead to fiscal year 2014, Defendant Conforti expected continued gross margin growth "driven by lower markdown rates and higher IMU, resulting from improved product execution and continued focus on inventory management." Regarding planned investment in the upcoming year, he offered, "Merchandising and design is one of the key areas we plan on increasing our strength in order to achieve the opportunities ahead of us."

93. During the question-and-answer session that followed, Defendants Hayne and Marlow fielded questions concerning first quarter 2014 sales trends, planned gross margin growth, and the health of the Urban Outfitters brand in particular. One analyst from Janney Montgomery Scott asked, "Spring trends really appeared to be in URBN's sweet spot for all divisions, for all three divisions. I was wondering if you could talk a little bit about quarter-to-date spring reception selling trends. Should we assume that sales trends are perhaps [] similar to fourth quarter overall?"

94. Defendant Hayne responded enthusiastically that Urban Outfitters had shown no signs of slowing entering the new year:

> Sure. I would say, overall, sales trends continue to be strong and very much like what we saw in the fourth quarter and in the holiday sales. It's coming in reasonably along the lines of what we saw in January, which is a very strong performance on the part of Free People brands. And I would say Anthropologie is seeing some momentum gain, and so we are very pleased with that. And Urban is basically on par with what we saw in the fourth quarter.
>
> So we are pleased to date. I think, along with everyone else, we had a little bit of a lull in the latter part of January, but from that period on, I think it has been pretty much the same story as what we had in the fourth quarter.

95.     On the topic of gross margins, a Robert W. Baird & Company analyst inquired, "Big picture wise, is there any reason why you shouldn't be able to eventually get back to your lower markdowns, to the 40%-41% levels that we saw a few years ago?" Defendant Hayne replied, "There is no reason to believe that we couldn't see a continued decrease in markdowns."

96.     When another analyst asked about the Urban brand's accessories business, Defendant Marlow praised the division's talented personnel and improved product assortment:

> The thing I would share most positively related to our accessory business is we saw the business coming back to where we wanted it to perform as we went through fourth quarter in North America. It has been a good, solid business for us in Europe, but we have had some difficulties in the assortment in North America but, I think, made good headway in Q4.
>
> I would say that that would be mainly tied to the talent of staff involved. We've filled some key roles in the area and are feeling like that that business is in pretty good shape as we get underway on this year.

97.     A Citigroup analyst then inquired as to the health of the Urban Outfitters brand as a whole: "Maybe a question for Ted, but we said Anthro was accelerating. I think we said Free People was also accelerating, and I guess there are reasons for both. But Urban, it sounded like, was just kind of holding its own. Is there anything to note there with the business? What is trending now and how do we feel about that as we move through spring?"

98.     Defendant Marlow took this opportunity to extoll the brand's ongoing success:

> The first thing I would do would be to advertise for our brand. We did put on $169 million worth of volume this last year and a mid-teen growth rate. So I think we are in a pretty healthy place right now, and I like it way the trends that we see in the market fashion-wise marry with the stories that we are telling at point of sale. We are just moving into a time period that the narrative in the business is in regard to the festival season which, as you can imagine, that works pretty well with our brand. And I am confident that, get some good warm spring weather for festivals, we can put up some good warm spring weather sales.

99.     Moreover, on the topic of weather, Defendant Hayne stepped in to reassure investors: "I think I can just speak for everyone. We were concerned when we entered the year,

given the weather that existed last year in the month of March. And so far, we are pleasantly surprised with how well the business is holding up, even though here on the East Coast, the weather is significantly less favorable to early purchases."

100.    Finally, in discussing gross margin growth one last time, Defendant Conforti again spoke of "improving our markdown rates as well as improving our initial markup" on a year-over-year basis in fiscal 2014.

101.    As a result of Defendants' positive statements concerning the Company's recent success, its plans for reduced markdowns, and the general health of the Urban brand, Urban Outfitters stock closed at $41.81 on March 12, 2013, up from a close of $41.50 on March 11, on unusually heavy trading volume.

102.    Further, analysts reacted positively to Defendants' statements, rating Urban Outfitters stock "Outperform," "Overweight," or "Buy" while praising the Company's continued sales momentum. For example:

(a)    In a report dated March 11, 2013, Oppenheimer noted that "The Picture Remains Bright" because "[t]he turnaround at the chain remains fluid, and importantly, QTD sales are trending in line with 4Q strength";

(b)    PiperJaffray also noted on March 11 that "quarter-to-date comps are tacking +HSD or better," and "[i]f recent momentum can be sustained into 2013 (Q4 comps were up 11%), this could easily translate into SG&A leverage and gross margins up 100+ bps";

(c)    Morgan Stanley's March 11 report affirmed, "Both URBN's accelerating sales growth and margin expansion trends central to our Overweight thesis continued in 4Q. We believe gains should continue through 2013, driving upwards earnings revisions and stock price appreciation"; and

(d)    In its report dated March 12, 2013, Janney Capital Markets rated the stock a "Buy": "We believe the trends for spring are squarely in URBN's sweet spot and believe all three divisions should benefit from the fashion newness in spring. We continue to remain confident that the turn in the business will continue throughout FY13 and will be driven by: 1) leadership changes that will continue to positively impact the business, 2) a focus on inventory discipline, and 3) improved merchandising at both UO and Anthropologie."

103.    Two days following Urban Outfitters' earnings release and conference call, Defendant Conforti attended the UBS Global Consumer Conference, held March 13, 2013. There, he reinforced the Company's continued sales momentum rolling into the first quarter 2014:

- "Second question was on -- trend? Okay. So, as Dick did mention on the conference call, right now through February and the first week or so of March, we are seeing our sales trend consistent with our holiday period last year. Anthropologie has accelerated slightly; Free People continues to have very strong results; and Urban Outfitters continues to perform well, as well."

- "[S]o far to date, our sales trends are consistent with our holiday period through the fourth quarter."

- On the Urban brand in particular, "[B]oth Urban Outfitters and Anthropologie will tell you that they, as we talk about the archery target, that they are on-target now. But they are not near the bull's-eye, and near where we've been historically, and there is certainly opportunity to improve. I think both Ted and David have done a great job of stabilizing and adding some additional talent back into the merchandising and design teams."

- On expected accomplishments in fiscal 2014, "I think the accomplishment is we're going to talk about continued progress – so, continued improvement in our product assortment; continued growth internationally; and certainly a continued strong topline sales number."

104.    After these positive but misleading results were announced and discussed, Defendant Hayne sold 385,730 shares of URBN common stock on March 22, 2013 at artificially

inflated prices for proceeds in excess of $15 million. Days later, on March 25, he sold another 898,063 shares for nearly $35 million, bringing his total over four days to over $50 million. These were Defendant Hayne's first sales of URBN common stock in more than 18 months.

105.     The Company's fourth quarter and fiscal year 2013 financial results also were incorporated in its fiscal year 2013 Form 10-K, filed with the SEC weeks later on April 1, 2013. Therein, Defendants reiterated: "Gross profit rates in fiscal 2013 increased to 36.9% of net sales, or $1.03 billion, from 34.8% of net sales, or $861 million, in fiscal 2012. The increase in the rate was primarily due to a reduction in merchandise markdowns."

106.     Regarding comparable retail sales growth, the 2013 Form 10-K offered, "Thus far during the first quarter of fiscal 2014, comparable Retail segment net sales are high single-digit positive."

107.     Moreover, Defendants Hayne and Conforti signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating they had reviewed the Form 10-K and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

108.     Further, Defendants Hayne and Conforti each signed SOX certifications that the Form 10-K "fully complies with requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company."

109.     On April 2, 2013, the day after the Company filed its 2013 Form 10-K, Defendant Conforti sold 5,000 shares of URBN common stock at artificially inflated prices, earning

proceeds of nearly $200,000. Like Defendant Hayne, Defendant Conforti had not sold Urban Outfitters common stock in the previous 18 months.

110.   For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's fourth quarter and fiscal year 2013 earnings release dated March 11, 2013, the earnings conference call held the same day, the UBS Global Consumer Conference held on March 13, and the 2013 Form 10-K filed on April 1, all of which touted strong growth Company-wide and continued sales momentum and product execution at the Urban brand in particular, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)   by the start of the Class Period, Urban Outfitters stores across the country already had begun experiencing depressed sales levels and were consistently failing to reach their projected monthly sales targets;

(b)   as a result of declining sales trends, beginning in 2013, the Company increased its weekly markdowns, storewide promotions, and other sales activities to unprecedented levels at Urban Outfitters stores nationwide;

(c)   during the Class Period, various markdowns and sales promotions at Urban Outfitters stores frequently were started earlier than planned and/or extended beyond their initial runs due to increased sales pressures;

(d)   as Defendant Conforti would later reveal, the Urban brand was "challenged" and management could have done "a better job" in terms of execution and product assortment, which was either known or knowable to the Defendants via their access to the Company's Intranet, which reflected declining sales trends and increased markdowns, as confirmed by numerous former insiders;

(e)     Defendants omitted to inform the market of the true extent of the Urban Outfitters brand's deteriorating sales trends, decelerating sales growth, and increased markdown activity, as well as the negative effect of the foregoing on the Company's overall comparable retail sales growth;

(f)     the Company's 2013 Form 10-K was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)     the SOX certifications executed by Defendants Hayne and Conforti included the misleading representation that the Form 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose that weaknesses within the Urban brand rendered the Company vulnerable to the same market conditions plaguing the rest of the retail industry.

**B.     First Quarter 2014**

111.    On April 4, 2013, Defendant Marlow participated in the Morgan Stanley Retail & Restaurant Conference, hosted by Morgan Stanley analyst Kimberly Greenberger.  Since "divisional CEOs within Urban Outfitters don't often get out to conferences," Greenberger took this opportunity to explore the Urban brand's business in depth.  One of her first questions centered on the brand's ability to maintain the holiday season's success entering the first quarter of fiscal 2014: "Last year Urban sales trends were some of the best in the portfolio of brands. There were a number of trends that were very favorable, I think, to the Urban division, and you had a phenomenal holiday season as well.  Obviously, we just got the 10-K update earlier this week, and there has been a little bit of a Q1 slowdown.  I know the weather has been really tough, but I thought maybe you could just talk about how do you view the slowdown and where do you see the opportunities from here?"

112.     Defendant Marlow showed no concern over weather or other market conditions.

Instead, he assured investors that, thanks to its product assortment and strong direct-to-consumer

sales, the Urban brand looked good "overall":

> I guess the number one thing that comes to mind is that, again, back to direct. We haven't skipped a beat in direct. Direct has really maintained its run rate for some time now over the last number of months. And if I look at the performance on the retail side, it is very specific by geography. I am an old-school retailer, and I don't like looking to the weather excuse as that's the one I am going to pull out of the hat. But we do run significant businesses if you start in Washington DC, go to Philadelphia, New York, Boston, over to Chicago, and all of Canada, we do run some very good sized store businesses in those markets. Those markets have underperformed warmer climates and balance of the country. Our Easter-to-Easter performance -- the week of Easter this year to last year we were up in the store group.
>
> So overall, I am feeling through what I am seeing out of warmer climate markets as well as what I have seen in the performance of direct; I am feeling good about our fashion content. I think that there is some change -- pronounced change -- going on in trending categories; and I think our team has done a good job of offsetting some volume risk with distorting other categories into the emergence of some new categories to perform. So, I'm feeling pretty good about it overall. I wouldn't say it's a robust market out there, but I am feeling good about our chances.

113.     Greenberger pressed further on the threat of extended winter weather: "In the past

when you have seen winter extend really far into spring, and then the weather finally breaks at

some point, how does that shift business? Does it shift it between quarters or do you get -- have

you seen just a hard and fast hit within the same reporting period, just as soon as the weather

breaks?"

114.     Again, Defendant Marlow did not miss a beat in touting Urban's chosen

assortment: "[Y]es, it can spike very dramatically. But I think that if we get just a more

reasonable weather situation coming through second quarter as it relates to the time period in the

year, we have learned a lot about what to have in the assortment at this point in time. It is

certainly warm weather related. I would like to think that that would be far more than just a momentary blip."

115. Finally, when Greenberger inquired as to opportunity for margin growth within the division, Defendant Marlow boasted of "opportunity in inventory management" to drive "a reduced markdown exposure."

116. On May 20, 2013, the Company issued a press release announcing first quarter 2014 financial results. The press release also was filed with the SEC on Form 8-K that same day. Urban Outfitters again reported "record sales" for the quarter, totaling $648 million, a 14% increase over the same quarter the prior year. Comparable retail segment sales increased 9% for the Company, while the Urban, Anthropologie, and Free People brands posted comparable retail sales growth of 6%, 8%, and 44%, respectively.

117. The Company's gross profit improved by 125 basis points over the same period the prior year, attributable to "a reduction in merchandise markdowns primarily driven by improvements at the Anthropologie brand." A statement from Defendant Hayne read, "Our brands delivered solid growth across all channels in the first quarter, especially in our direct-to-consumer channel."

118. Defendants hosted a conference call with analysts that same day, May 20. Defendants Conforti and Hayne kicked off the call with opening remarks highlighting the Company's reduced markdowns and continued growth across all brands:

- Conforti: "The gross profit rate improved by 125 basis points to 36.8%. The improvement in gross profit rate was primarily due to a reduction in merchandise mark downs mainly driven by improvements at the Anthropologie brand."

- Conforti: "We believe our gross margin growth opportunities will be primarily driven by lower mark down rates and higher initial margins

resulting from improved product execution and continued focus on inventory management."

- Hayne: "While the turnaround at Anthropologie certainly helped to drive Urban's record first quarter sales, Anthropologie was not alone. The Free People brand produced outstanding comp gains across all of their channels. In fact, all brands continue to build upon the successes established last year, and each posted record first quarter sales."

119. During the question-and-answer session that followed, one of the first questions related to the Urban brand's success in the first quarter and its prospects for the remainder of the year: "I was wondering if you could talk a little about Urban Outfitters and how you saw their progress in the first quarter and what we could look forward to from that brand, some of the new initiatives there for fiscal '14."

120. Defendant Marlow offered the following endorsement, placing emphasis on the strength of the brand's product assortment in terms of both the first quarter and for future quarters:

> In regard to the Urban brand in the quarter, the focus really for -- key focus over the past year as you know has been distorting our opportunity through direct-to-consumer. We realized a very strong quarter, both in the North American and European market and direct. While our North American and European retail businesses did treat us positively, the distortion of the business really was in the direct side. We've been driving that through customer acquisition and retention along with increasing our style offer to customer. I believe this last week we were operating the Urban North America business with somewhere around 18,000 styles and the assortment up against about 10,000 last year.
>
> So it's dramatically increased in regard to the size of offer as well as the database that we are reaching out to today is nicely increased over last year's database size as well. In regard to the overall content of the mix, we had good performance out of the fashion businesses in North America and in Europe. The weather was not necessarily our best friend in North America in the Northeast, as it pertains to some of our offer. But we felt good about how we look. We feel good about how we look going into second quarter, and it's a moment of change in the mix in regard to what we're seeing in silhouette performance. And I think that our team's got a good -- done a good job of identifying that and fueling our inventory with appropriate product.

45

121.   When asked about the impact of weather during the quarter, Defendant Hayne refused to make any excuses because "fashion always trumps weather":

> Sure. I'll talk about the weather impact, because I'm sure it's on the minds of several of the analysts. . . . We saw some effect of weather based on geography, meaning that the weather in the West Coast was certainly warmer and more conducive to spring/summer purchasing than here on the East Coast. And we did see some sales differential across all brands as a result of that. But I really think that we prefer not to talk about weather. We believe that fashion always trumps weather. If we have the right fashion, the customer spends, and if we don't, the weather may be a factor, but it's much less relevant.

122.   One analyst from Goldman Sachs asked for more detail on gross margin improvement. Defendant Conforti assured, "We remain focused on steady ratable improvement from quarter-to-quarter and continuing -- our biggest opportunities in gross profit margin, continuing to be mark downs followed by IMU."

123.   Defendant Marlow later fielded a question about the Urban brand's expanded assortment online, and differences in price points between the stores and direct-to-consumer channels. He spoke highly of Urban's online product assortment, particularly in swimwear and home furnishings, even concluding that online success with home furnishings has the Company more "bullish" about similar in-store business:

> We have continually offered a broader assortment. We've lengthened the selling season as well on swim. I don't doubt that there is online a year-round opportunity to pursue in the swim business. As it pertains to the home business, we have identified that as a business that we're very interested in building out with a broader product assortment, specifically focusing on certain categories within home. Home is a very important piece in conveying the overall concept of Urban which it's not simply an apparel men's and women's business. We like involving the home environment and our story and feel like we've been a bit negligent in building out the opportunity in that particular area of the business.

> We do penetrate -- our customer has taken us there. We do penetrate much higher in our home business in terms of the business we do in direct versus store. But some of the signal that's we're getting off product assortment through direct are leading us to be more bullish in our thoughts on home in the store environment as well.

124. Finally, in response to a query on efforts to drive store traffic, Defendant Hayne highlighted successful campaigns at the Urban brand: "At the Urban business, there are a number of efforts afoot to actually -- through e-mail communication give notice of certain events that are happening in stores and promote locally. So that's been reasonably successful, and we intend to continue to do that, and some of the other brands will probably follow suit."

125. Analysts reacted positively to Defendants' statements concerning the Company's continued success, its plans for reduced markdowns, the lack of any material impact by weather, and the strong product assortment at the Urban brand. For example:

(a) In a report dated May 20, 2013, BMO Capital Markets highlighted, "Although all brands outperformed in warmer weather regions, management feels the product is trend-right, noting that it has successfully capitalized on a silhouette change at the Urban brand." The report also noted "ongoing opportunity to further reduce markdown levels," and that "[p]articularly at Urban, the expansion of web-exclusive product has been a key driver of online growth, with 18,000 styles available online versus 10,000 last year";

(b) Ascendiant Capital Markets published a report on May 20 stating, "[A]lthough we believe Q1 results for most retailers were adversely impacted by unseasonable weather and various macroeconomic factors, both of which led to an uptick in promotional activity across the sector, we believe URBN held its own due to assortment improvements";

(c) On May 21, 2013, Janney Capital Markets added URBN to its *Janney Best Ideas List* ("designated for stocks in which we have the greatest confidence in stock appreciation over the near-/medium-term") at the expense of rival Abercrombie & Fitch because "[a]lthough management did recognize that weather created significant challenges during the quarter, particularly in the Northeast, they expressed confidence that they are on target from a product

offering and fashion standpoint at all three divisions, which they stated will 'always trump weather.' As the weather continues to turn to warmer temperatures, we believe URBN stands to benefit as one of the companies to capitalize the most on pent-up demand"; and

(d)     Jefferies' May 21 report offered the following "Key Takeway": "The URBN story continues to chart its course of topline and margin improvement with the Urban Outfitters brand delivering well against a tough compare and traction building at Anthropologie." The report continued, "Topline and margin trends at the namesake Urban Outfitters brand continued to capitalize on a strong product assortment in 1Q. Management's focus on improving the product, keeping inventories leaner and boosting marketing is clearly paying off with all categories posting positive comps. We see more opportunity ahead to trim markdowns further and increase full-price selling into 2Q";

(e)     Credit Suisse's May 21 report reiterated its "Outperform" rating and noted, "In our view, the last three quarters' results provide support for the view that URBN is adequately addressing prior execution and competitive challenges"; and

(f)     RBC Capital Markets' May 21 report summarized its "Outperform" rating as follows: "URBN reported solid 1Q results with momentum continuing into 2Q. Management is beginning to make progress on their multiple initiatives, which seem to be positively impacting profitability. In addition, the concepts and their merchandise assortments are unique and stand out in the crowded apparel space. We continue to recommend the shares." To be sure, the report noted, "Despite weather which was not helpful in 1Q, URBN delivered comparable retail segment growth of 9%, gross margin improvement of 120 basis points, and EPS growth of 36%. We believe this speaks to the unique nature of the URBN concepts and the differentiation provided by the assortments"; and

(g)     On May 22, 2013, J.P. Morgan rated Urban Outfitters stock "Overweight" because "[w]ith comps likely running at a relatively similar level to 1Q, we believe URBN will continue to post impressive results and we continue to believe in the longer term growth opportunities with an emphasis on the ongoing margin opportunity through improving markdown rates, structural benefits from the omni-channel push and ultimately expense leverage."  The report continued, "With URBN's 1Q13 9% comp suggesting ongoing comp acceleration, it is clear that the company continues to progress healthily, with Anthro showing an impressive 8% comp driven largely by healthy full price sell though, while the core Urban division slowed to a 6% gain as they lapped very strong compares from the weather and color trends LY." "We continue to expect that with inventory under control and management focused on improving product offerings, URBN represents an attractive growth opportunity with significant runway for both top- and bottom-line growth."

126.    The Company's first quarter 2014 financial results also were incorporated in its first quarter 2014 Form 10-Q, filed with the SEC weeks later on June 10, 2013.  Therein, Defendants reiterated: "The increase in the gross profit percentage in the first quarter of fiscal 2014 was principally due to a reduction in merchandise markdowns, primarily driven by improvements at the Anthropologie brand."

127.    On the subject for comparable retail sales growth, the first quarter 2014 Form 10-Q offered, "Thus far during the second quarter of fiscal 2014, comparable Retail segment net sales are high single-digit positive."

128.    Urban Outfitters' first quarter 2014 Form 10-Q also contained certifications by Defendants Hayne and Conforti that were materially similar to those identified above in ¶¶107-108.

129.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Morgan Stanley Retail & Restaurant Conference held April 4, 2013, the Company's first quarter 2014 earnings release dated May 20, the earnings conference call held the same day, and the first quarter 2014 Form 10-Q filed on June 10, all of which touted continued momentum Company-wide and strong product assortments across the board and at the Urban brand in particular, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    by the start of the Class Period, Urban Outfitters stores across the country already had begun experiencing depressed sales levels and were consistently failing to reach their projected monthly sales targets;

(b)    as a result of declining sales trends, beginning in 2013, the Company increased weekly markdowns, storewide promotions, and other sales activities to unprecedented levels at Urban Outfitters stores nationwide;

(c)    during the Class Period, various markdowns and sales promotions at Urban Outfitters stores frequently were started earlier than planned and/or extended beyond their initial runs due to increased sales pressures;

(d)    as Defendant Conforti would later reveal, the Urban brand was "challenged" and management could have done "a better job" in terms of execution and product assortment, which was either known or knowable to the Defendants via their access to the Company's Intranet, which reflected declining sales trends and increased markdowns, as confirmed by numerous former insiders;

(e)     Defendants omitted to inform the market of the true extent of the Urban Outfitters brand's deteriorating sales trends, decelerating sales growth, and increased markdown activity, as well as the negative effect of the foregoing on the Company's overall comparable retail sales growth;

(f)     the Company's first quarter 2014 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)     the SOX certifications executed by Defendants Hayne and Conforti included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose that weaknesses within the Urban brand rendered the Company vulnerable to the same market conditions plaguing the rest of the retail industry.

**C.     Second Quarter 2014**

130.     On August 19, 2013, the Company issued a press release announcing "record" sales and earnings for the second quarter 2014. Net sales for the quarter rose to $759 million, marking a 12% improvement over the same quarter the prior year. Comparable retail segment sales grew 9% for the Company, and the Urban, Anthropologie, and Free People brands likewise achieved comparable retail sales growth of 5%, 9%, and 38%, respectively.

131.     A statement by Defendant Hayne claimed Urban Outfitters' strong results "were driven by a favorable customer response to our product offerings, improved merchandise margins, the opening of additional stores, and better creative and marketing initiatives in our direct-to-consumer channel."

132.    Gross profit rate improvements of 169 basis points for the second quarter 2014 and 148 basis points for the first half of fiscal 2014 were "primarily due to a reduction in merchandise markdowns primarily driven by improvements at the Anthropologie brand."

133.    The Company hosted a conference call with analysts that same day, on August 19, to discuss second quarter 2014 financial results. Defendants Conforti and Hayne opened the call with prepared remarks highlighting the Company's reduced markdowns and improved product execution, while tempering the Urban brand's "good but not exceptional" results:

- Conforti: "The improvement in gross profit rate was primarily due to a reduction in merchandise markdowns mainly driven by improvements at the Anthropologie brand."

- Conforti: "We believe our gross margin growth opportunities will primarily be driven by lower markdown rates and higher initial margins, resulting from improved product execution and continued focus on inventory management."

- Hayne: "Turning to profits, higher sales, better initial margins, more compelling product and effective expense control all combined to create record earnings. The improvements in product led to higher full-price sell-through's and lower merchandise markdowns. In total, gross margins improved an inspiring 169 basis points over the same period last year and operating profit jumped to just under 16% of sales. This is especially noteworthy since nine quarters have passed since we delivered a profit rate this strong."

- Hayne: "The Urban Outfitters brand delivered good but not exceptional quarterly results. Ted and his team faced difficult comparisons because their second-quarter results last year were especially strong. This quarter, they did post top-line growth with significant gains in the direct-to-consumer channel, but bottom-line contribution reflected the effects of increased promotional activity during the quarter."

134.    During the question-and-answer session that followed, the very first question asked how URBN had managed to rise above the generally dour retail landscape: "I wanted to ask you about the strength that you saw in July. Was it across all three brands? And what do you

think the differentiating factor was relative to the quite negative mall traffic that we saw across the rest of the world of retail?"

135. Defendant Conforti credited the Company's "product offering" for its continued success: "Well, the business we saw in July essentially mirrored what we saw for the entire quarter. So the strength of the brands that you saw in the comps that Frank gave are the basically the strength that we saw in July. And I don't think there's anything that was special about July. I think we had a number of situations where our product offering was, I would say, much improved over the prior year, and I think that that was the primary driver of the comp sales."

136. An analyst from PiperJaffray echoed this sentiment: "I was just wondering if you could share with us a little bit more on the mall versus non-mall stores. We're all just trying to figure out here. Obviously, you guys were just kind of operating in [y]our own solar system, and kudos to you for that, but we're still trying to figure out what's going on with the mall versus non-mall stores."

137. Defendant Hayne simply noted the brands' continued success during the quarter: "I don't think there was any consistency, Neely, across the brands. At Urban, the mall stores performed slightly better than the other stores, and Anthropologie was the opposite. So I don't think that there is anything we can glean or any trend that seems aberrant to what's happened to the brands in the past. So I'm sorry I can't shed any light on that, but I really don't think there's anything that we can add."

138. Later, an analyst from JJK Research noted the competitive environment for the Urban brand in particular. This analyst wondered aloud whether Defendant Hayne's prior remarks might have signaled an expected slowdown to come: "And then for Ted, I know the environment is pretty competitive. Your fall assortment is highly differentiated to me,

particularly in the bottoms category. But given the environment, should we be thinking that it will be hard for you guys to break out of beyond where you are right now, which is pretty darn good, but I'm just wondering if Dick was delivering a message."

139.    Defendant Hayne quickly quashed any such concern by boasting of Urban's product assortment:

> Janet, I'll touch on -- you mentioned specifically the bottoms assortment being differentiated. We feel like there are a number of categories that are differentiated versus where the business performed last year. Obviously, you know the strength of the denim business in last year's mix and we had a lot of concern about denim coming into the back-to-school time period.

> Our other bottoms categories on the women's side have done a very good job of offsetting that volume that we were up against. We were bullish on categories other than denim, but the good news to me as we got into the first part of August is that although the denim assortment has been pared back some this year, its performance is exceeding plan. We actually have seen nice performance specifically in the direct side of the business versus what we thought we would see out of denim for this time period.

140.    When later asked about lower average selling prices in relation to comparable retail sales growth, Defendant Hayne offered assurances for the Urban brand in particular: "Well, as to the average selling price, that's a call that's made by the merchants in each brand and I don't think that there was necessarily a strategic initiative around that. I think that in the case of Urban, the average selling price probably came down just a tad, greater than we wanted it to. And I think that that is in the process of being corrected. So, I don't think that there is any change of philosophy or any change of strategy around average selling price."

141.    Finally, Defendant Hayne was presented with a question regarding the current fashion trends propelling Anthropologie's business: "How long in your experience do you think that those fashion trends that are driving that business will last? And are there any structural changes to the way you're developing new fashions or personnel changes that make this a sustainable trend?"

142. Speaking to the Company's entire business more generally, he responded with confidence in his management team's ability to stay ahead of the fashion curve: "We're laughing around the table, Laura, because those trends often last for about four weeks between. But, in seriousness, I think that there's been a lot of changes that Dave has done, positive changes that allow structurally and personnel-wise for us to more accurately predict what the fashion is going to be. And without . . . being too flip about it, we absolutely want the fashion to change. If the fashion were not to change, we would be in big trouble."

143. As a result of Defendants' reassurances concerning the Company's continued success, its plans for reduced markdowns, and the overall strength of its product assortments, particularly at the Urban brand, Urban Outfitters stock closed at $43.19 on August 20, 2013, up over 8% from a close of $39.92 on August 10, on unusually heavy trading volume.

144. Further, analysts continued to respond to Defendants' statements with fervor, offering glowing endorsements for the Company's unique ability to rise above the general retail morass during the second quarter. For example:

(a)     RBC Capital Markets published a report on August 19, 2013 under the heading "Differentiated Product Gives You Differentiated Comps." "Our View: URBN reported solid 2Q results with EPS coming in ahead of our estimate and Street consensus. URBN did not seem to experience the weak traffic and aggressive promotions that have been rampant among other retailers we have heard from so far in 2Q." The report continued, "2Q at URBN looks different than 2Q elsewhere. Comps of +9% came in at the high-end of our +7-9% expected range. We believe they were able to achieve this through continuing to offer compelling and unique product across all three of their concepts." Moreover, "URBN appears to be one of the few entering Fall 2013 with strong momentum";

(b)     Under the heading "URBN: They're Just Better," Wells Fargo Securities' August 19 report summarized URBN's second quarter as follows: "A fantastic quarter and we believe it calls into question the weather excuse many have used to explain weakness in FQ2. We believe URBN will prove to be one of the standouts amongst mall retailers in what is likely to be a mostly weak earnings season. The company continues to benefit from differentiated concepts that focus more on fashion, rather than the core basics that their competitors depend on. URBN has a greater ownership of fashion mindshare than their competitors and structurally are more capable to react to changing trends in general, in our view, which appears to be paying off currently";

(c)     Macquarie (USA) Equities Research pronounced on August 19 that "URBN turned in a stellar quarter with sales that slightly topped high expectations and margins that beat. The company has proven once again that it doesn't really operate in the same competitive dynamic as the rest of the mall. When URBN's product is right, it's selling no matter the backdrop. The company saw strength across the quarter at all three brands";

(d)     In its report dated August 20, 2013, Jefferies' offered the following "Key Takeaway": "Mgmt did a good job navigating 2Q. The topline remains on an upward trajectory here at both the Urban Outfitters and Anthropologie divisions, and this has translated into an improving margin and earnings growth profile." The report focused on "compelling" product assortment, noting, "Trajectory Ahead Looks Solid. Both the Urban Outfitters and Anthropologie brands saw improving topline trends in 2Q. These gains have been driven by the company's focus on providing more compelling, trend right product and more effective marketing campaigns";

(e)     Trefis noted August 20 that "[t]he momentum in Urban Outfitters' (NASDAQ:URBN) business continued in Q2 fiscal 2014 despite economic headwinds.  The retailer reported a staggering 25% jump in profits, which was better than the market's expectations. [1] In a weak quarter for apparel retail, the company's revenues and comparable store sales increased by 12% and 9% respectively with gross margins up 169 basis points. [2] This performance can be attributed to strong customer response to its product offerings, fewer markdowns and rapid e-commerce growth. We expect Urban Outfitters' growth to continue in the near term";

(f)     Wedbush Equity Research issued a report on August 20 upgrading the stock to "Outperform" based on "(1) on-trend merchandise, (2) solid inventory control, (3) stellar online/mobile penetration, (4) compelling growth from existing brands and potential acquisitions."  Regarding the Urban brand in particular, the report expressed optimism despite "choppiness" in the industry: "At UO, specifically, CEO of Urban Outfitters Brand Ted Marlow indicated that early BTS denim sales have exceeded their expectations given the tough compares a year ago, which we believe bodes well for their ability to continue market share gains in H2 despite choppiness in teen retailing";

(g)     Oppenheimer similarly showed no concern for the Urban Outfitters brand in its August 20 report entitled "Decoupling from the Group; Raising EPS Estimates": "UO lagged Anthro for the past two quarters, as fashion trends are more muted on top of difficult colored bottoms comparisons. Still, UO is one of more differentiated concepts out there, plus with fast lead times, this division should be a faster fix than most";

(h)     Morgan Stanley published a flattering report on August 20 entitled "Sunny URBN Skies Amidst Stormy Retail Clouds."  The report noted, "URBN's 2Q beat reflects strong

top-line momentum and an intact self-help margin story. The company continues to out-execute peers." Moreover, "Very solid +9% 2Q comp growth despite softening traffic trends across retail: We think 2Q sales outperformance vs. peers demonstrates outstanding management execution. URBN's rebuilt executive team is leading a meaningful turnaround."

145. Two weeks later, on September 3, 2013, with the stock price still artificially inflated from Defendants' fraud, Defendant Conforti sold another 22,000 shares of Urban Outfitters stock for proceeds in excess of $919,000, bringing his Class Period total to more than $1.1 million.

146. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's second quarter 2014 earnings release dated August 19, 2013 and the earnings conference call held the same day, all of which boasted of continued sales momentum Company-wide despite difficult industry headwinds, as well as margin growth opportunities and compelling product assortments at all three primary brands, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     by the start of the Class Period, Urban Outfitters stores across the country already had begun experiencing depressed sales levels and were consistently failing to reach their projected monthly sales targets;

(b)     as a result of declining sales trends, beginning in 2013, the Company increased weekly markdowns, storewide promotions, and other sales activities to unprecedented levels at Urban Outfitters stores nationwide;

(c)     during the Class Period, various markdowns and sales promotions at Urban Outfitters stores frequently were started earlier than planned and/or extended beyond their initial runs due to increased sales pressures;

(d)     as Defendant Conforti would later reveal, the Urban brand was "challenged" and management could have done "a better job" in terms of execution and product assortment, which was either known or knowable to the Defendants via their access to the Company's Intranet, which reflected declining sales trends and increased markdowns, as confirmed by numerous former insiders;

(e)     Urban Outfitters' back-to-school assortment and corresponding price points already had been set months prior, by April 2013, yet Defendants touted margin growth opportunities to be driven by lower markdown rates without any mention of the return of Urban Outfitters' planned 30% off Labor Day promotion, which had been successfully avoided the year prior; and

(f)     Defendants omitted to inform the market of the true extent of the Urban Outfitters brand's deteriorating sales trends, decelerating sales growth, and increased markdown activity, as well as the negative effect of the foregoing on the Company's overall comparable retail sales growth.

## VI.     THE TRUTH IS REVEALED

147.    Then, after the market closed on September 9, 2013, investors learned the truth about the Company's precipitous deceleration in comparable sales growth driven by poor performance at the Urban brand owing to its faltering product assortment, when Defendants filed a quarterly financial report on Form 10-Q disclosing the Company's second quarter 2014 financial results and also commenting on third quarter 2014 results to date: "Thus far during the third quarter of fiscal 2014, comparable Retail segment net sales are mid single-digit positive."

The market was shocked by this deceleration in sales growth, which previously had hovered just above or beneath 10% over the last three quarters. Analysts immediately identified the Urban Outfitters brand as the drag on the Company's growth:

- Wells Fargo Securities published a report on September 9 entitled "URBN: Urban Stalling, But Anthro/Free People Cruising," which noted: "Urban Outfitters running a fever: Our talks with management indicate that Urban Outfitters (UO) may have suffered from fashion misses. However, it appears to us that UO is not immune to the general sickness among teen retailers this back-to-school (BTS) season."

- Oppenheimer's report on September 9 flagged a "Short-term disappointment" in reported quarter-to-date comps, while noting the "Urban division [was] lagging"

- In a September 9 report entitled "URBN 10-Q Update Disappointing, 3QTD Comp +MSD," Morgan Stanley noted that "[t]he sales slowdown at the Urban division is clearly disappointing"

- William Blair's September 10 report, "Deceleration in Comp Trend Likely Attributable to Urban Outfitters Division," indicated that the Urban brand's "sales trends have continued to weaken into the low-single-digit range so far this quarter (versus the second quarter's 5% gain), with current trends likely roughly flat. While we believe Urban Outfitters' results remain superior to much of teen apparel, it clearly has not been immune from a fairly lackluster back-to-school season with few must-have purchases."

- In a September 10 report entitled "3QTD Retail Segment Comps Running +MSD; UO Division Drives the Deceleration," Janney Capital Markets offered: "We believe the entire issue for URBN's slowing sales stems from the UO division, which we believe showed material slowing at the end of August and MTD September. Over Labor Day weekend, the UO division ran an additional 30% off all clearance, which they did not run last year."

148. While such results would have been acceptable for a general retailer like Walmart, specialty retailers like Urban Outfitters are expected by analysts and investors to produce double-digit growth. At the Goldman Sachs Global Retailing Conference on September 11, 2013, Defendant Conforti confirmed the Urban brand was the laggard. The conference moderator jumpstarted the conversation by immediately referencing the Company's

disappointing quarter-to-date sales growth: "So just to kick right into it, you guys came out with your 10-Q which reported modest deceleration in overall comps. Maybe starting with that and building on one of the questions we are asking every company, as you guys think about relative to your 2Q what your expectations are in terms of the environment for the second half and the early read on 2014 as in sort of better or worse, similar."

149.     Regarding the growth issues, Conforti conceded "it's a little different by brand," but proceeded to praise Free People and Anthropologie before singling out the Urban Outfitters brand as the problem. "Right now our Free People brand continues to click on all cylinders and continues to execute at an incredibly high level." "[W]e don't see any slow down there at all." Concerning Anthropologie, it "also continues to make progress on a year-over-year basis, just continues to improve the product assortment . . . [and] to gain momentum. We feel very good about the back half of the year."

150.     However, "[t]he Urban brand right now is the brand that is the most challenged out of the three big brands that are in our portfolio." "We're certainly not blind to some of the news and what is going on in the industry and whatever is going on with the consumer. But right now we believe that we can do a better job executing and we believe we can do a better job with what we control." Defendant Conforti then reiterated, "[T]he [U]rban brand will be the one that will probably be the most challenged towards the back half of the year."

151.     Later pressed on "the specifics" with respect to missed execution at the Urban brand, Defendant Conforti placed blame "across all divisions right now . . . it is not a specific class, men's, women's, WAC . . . [no] miss in one certain category. I would say it is across the entire assortment." He added, "Right now we think that there are some very nice fashion trends that are out there and it is the opportunity for us to change and make sure that our assortment is

appropriate and is what the consumer is looking for. But it is not certain big categories or certain big divisions; we think it is across the assortment that the opportunity is just for us to provide more of what the consumer is looking for right now."

152. When asked about plans for moving the brand forward, Defendant Conforti again identified "a product assortment challenge that we're up against right now," but offered, "I think once we have the assortment rebalanced and fixed to where it will resonate better with the consumer we continue to see opportunity for improvement with the Urban brand."

153. Analysts recognized the importance of these revelations, which sharply contradicted Defendants' misleadingly positive statements throughout the Class Period about the Company's opportunity for margin growth as well as the strength of Urban Outfitters' product assortments, including at the Urban brand in particular. In the wake of this news, analysts issued reports highlighting the threat of the Urban brand to the Company as a whole. For example, in its September 11 report entitled "URBN: 3Q Updated Deceleration; Lowering Estimates," KeyBanc Capital Markets warned, "We believe further deceleration at the Urban Outfitters brand over the last few weeks will more than offset the positive momentum at Anthropologie and Free People and likely put pressure on overall sales growth and gross margin expansion in the 3Q."

154. Defendants' revelations, and the resulting analyst commentary, immediately caused the Company's stock price to plummet. In just one trading day, the stock was punished by *over 10%*, falling from a close of $42.71 on September 9, 2013 to a close of $38.35 on September 10, 2013 on abnormally high trading volume (over *eight times* the average daily trading volume over the preceding ten days). Urban Outfitters' investors lost millions as a result of this massive sell-off.

## VII. LOSS CAUSATION

155. As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated Urban Outfitters' stock price by misrepresenting and concealing the true weakness of the Urban brand and the Company's resultant vulnerability to negative market trends, including the facts that: (a) by the start of the Class Period, Urban Outfitters stores across the country already had begun experiencing depressed sales levels and were consistently failing to reach their projected monthly sales targets; (b) as a result of declining sales trends, beginning in 2013, the Company increased weekly markdowns, storewide promotions, and other sales activities to unprecedented levels at Urban Outfitters stores nationwide; (c) during the Class Period, various markdowns and sales promotions at Urban Outfitters stores frequently were started earlier than planned and/or extended beyond their initial runs due to increased sales pressures; and (d) decelerating sales growth at the Urban brand was weighing heavily on the Company's overall comparable retail sales growth. Defendants' false and misleading statements and omissions, individually and collectively, concealed the true business prospects of the Company, resulting in Urban Outfitters' stock being artificially inflated until, as indicated herein, the relevant truth about the Urban brand's weak product assortment and the Company's resultant decelerating sales growth was revealed. While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Urban Outfitters' stock price and the image of its future business prospects to give the market the false notion that Urban Outfitters was immune to the conditions plaguing the retail market generally. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial

contributing cause of, Urban Outfitters' stock trading at artificially inflated levels, reaching as high as $44.96 during the Class Period.

156.    The true picture about the Urban brand's weak product assortment and declining sales growth emerged after the markets closed on September 9, 2013, when the Company filed its Form 10-Q for the second fiscal quarter of 2014, which also commented on the Company's results and expectations for the third fiscal quarter of 2014 as of that date. Defendants revealed, "Thus far during the third quarter of fiscal 2014, comparable Retail segment net sales are mid single-digit positive." This was decidedly lower than the previous quarters' growth and lower than what analysts had expected. Moreover, blame was placed squarely on the Urban Outfitters brand at the Goldman Sachs Global Retailing Conference on September 11, 2013. There, Defendant Conforti confirmed that Free People had "continue[d] to click on all cylinders," that Anthropologie was "continu[ing] to gain momentum," but that the Urban Outfitters brand was the Company's "most challenged." Within that brand, there were issues "across all divisions," basically "across the entire assortment." In spite of acknowledged industry headwinds, Defendant Conforti confessed they could "do a better job executing and . . . a better job with what we can control." Accordingly, "the [U]rban brand will be the one that will probably be the most challenged towards the back half of the year."

157.    When Urban Outfitters provided the market with these revelations, it was an indication to the market that Defendants' prior Class Period statements were false and misleading. As a result, Urban Outfitters' stock immediately dropped *over 10%*, from a close of $42.71 on September 9, 2013 to a close of $38.35 on September 10, 2013, on abnormally high trading volume, as the market reacted to revelations in the Company's Form 10-Q. The market's negative reaction to Urban Outfitters' revelations is demonstrated in the following stock chart:



158. The rapid decline in Urban Outfitters' stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding failed product assortments and resultant deceleration in sales growth, which had been concealed or misrepresented by Defendants' scheme and misstatements. Thus, the revelation of truth following the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Urban Outfitters' prior statements were false and misleading. In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

159. The timing and magnitude of Urban Outfitters' stock price decline from September 9 through September 11, 2013 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of Urban Outfitters' stock price from

65

the aggregate stock price of Standard and Poor's 500 Apparel Retail Index[9] as the revelation of the truth became known to the market. As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on September 9 and September 11, 2013, causing Urban Outfitters' stock price to fall and remain below its peer index.



160. The economic loss, *i.e.*, damages, suffered by Plaintiff was a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated Urban Outfitters' stock price and the subsequent significant decline in the value of Urban Outfitters' stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

[9] Urban Outfitters has identified the Standard and Poor's 500 Apparel Retail Index as a benchmark for its common stock performance. *See, e.g.*, Urban Outfitters' Annual Report on SEC Form 10-K for the Fiscal Year Ended January 31, 2013, at 22.

## VIII. ADDITIONAL SCIENTER

161.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

162.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Urban Outfitters, its operations, and its business practices, their control over and/or receipt of Urban Outfitters' materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Urban Outfitters' sales trends and product assortments, were active and culpable participants in the fraudulent scheme alleged herein.    The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.    The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

163.    Defendants Hayne and Conforti also undertook the affirmative obligation to obtain knowledge in order to ensure the Company's disclosures to the market were truthful by executing SOX certifications (*see* ¶¶107-108, 128).

164.    These facts, in conjunction with the additional indicia of scienter detailed below, collectively support a strong inference of each Individual Defendant's scienter.

## A. Retail Sales at the Urban Outfitters Brand Were the Company's Core Operations

165.   As further detailed above in ¶31, during the Class Period, retail sales at the Urban Outfitters brand were the single largest revenue stream for the Company – representing 44.5% of consolidated net sales through the first three quarters of fiscal 2014 – and were therefore the core operations of Urban Outfitters. Therefore, the success of that brand's product assortments and the brand's ability to maintain strong comparable retail sales growth were of critical importance to the Company's business.

166.   During the Class Period, the Individual Defendants were high-ranking officers (*i.e.*, CEO or CFO of either the Company or the Urban Outfitters brand group) who were heavily involved with, and had day-to-day responsibilities concerning, the Company's and its brands' overall sales trends. Accordingly, through the receipt of internal reports and involvement with daily operations, the Individual Defendants were intimately aware of the true nature and prospects of the Urban brand's sales growth, and repeatedly touted the strength of the brand in terms of the Company's continued sales momentum during the Class Period. As a result, as Urban Outfitters' most senior executives, the Individual Defendants knew, or, at a minimum were severely reckless in not knowing, about the weakness in the Urban brand's product assortment and resultant deceleration in sales growth, which significantly impacted core operations. By choosing to speak about Urban Outfitters' comparable retail sales growth and each brand's continued success in the face of otherwise difficult market conditions during the Class Period, the Individual Defendants led investors to believe that they had knowledge, and/or had acquired knowledge, of the Company's growth prospects and were speaking truthfully.

**B.**    **The Individual Defendants Had Access to Store Sales Data and Planned Promotional Activities Via the Company's Intranet**

167.    As detailed above, the Individual Defendants had intimate knowledge of the Urban brand's lagging sales performance and increased promotional activities throughout the Class Period. *See* ¶¶79-82. Indeed, sales data for all Urban Outfitters stores was published daily on the Company's Intranet, which was freely accessible by all Company employees even at the store level. Moreover, weekly markdowns, storewide promotions, and other sales activities were published weekly to Urban Outfitters stores using the Company's internal newsletter "The Slant," which was distributed to the stores over the Intranet. This further demonstrates that, throughout the Class Period, Defendants closely monitored, and possessed knowledge of, Urban Outfitters store sales trends and related promotional activities.

**C.**    **The Individual Defendants' Suspicious Insider Trading**

168.    While in possession of non-public adverse information regarding the Urban brand's faltering product assortment and rapidly decelerating sales growth, Defendants Hayne and Conforti took full advantage of the artificial inflation of Urban Outfitters' stock price caused by their misrepresentations and omissions. In fact, during the Class Period, these Individual Defendants disposed of a combined 1.3 million shares of common stock for proceeds greater than *$51 million*.

169.    Indeed, on March 22 and March 25, 2013, around the time URBN was completing its back-to-school purchases, Defendant Hayne sold 385,730 shares and 898,063 shares of Urban Outfitters common stock at artificially inflated prices of $39.18 and $38.87 per share, respectively, for total proceeds of $50,020,609. Defendant Hayne's stock sales were unusual and suspicious in timing and amount because, in the 18 months preceding the Class Period – a period three times longer than the Class Period itself – he had not sold a single share of Company stock.

Yet, with the stock price artificially inflated during the Class Period, Defendant Hayne unloaded a whopping *$50 million* worth of shares.

170. On April 2 and September 3, 2013, Defendant Conforti sold 5,000 shares and 22,000 shares of Urban Outfitters common stock at artificially inflated prices of $39.99 and $41.80 per share, respectively, for total proceeds of $1,119,550. These stock sales were unusual and suspicious in timing because, like Defendant Hayne, Defendant Conforti had not sold a single share of Company stock in the 18 months preceding the Class Period. In addition, Defendant Conforti's stock sales were unusual and suspicious in amount because they liquidated more than *99%* of his common stock holdings in total.

171. The foregoing stock sales, all of which were unusual and suspicious in both timing and amount, further support a strong inference of Defendants Hayne and Conforti's scienter.

## IX. PRESUMPTION OF RELIANCE

172. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose. Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, the Defendants failed to disclose material information regarding the Urban Outfitters brand's failing product assortment and resultant deceleration in growth both within the brand and Company-wide.

173. Plaintiff also is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for Urban Outfitters' publicly traded securities was open, well-developed, and efficient at all times. As a result of these materially false and misleading statements, Urban Outfitters' publicly traded

70

securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Urban Outfitters' publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Urban Outfitters, and have been damaged thereby.

174. At all relevant times, the market for Urban Outfitters' securities was an efficient market for the following reasons, among others:

(a) Urban Outfitters' stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, Urban Outfitters regularly made public filings with the SEC, including its Forms 10-K, Forms 10-Q, and related press releases;

(c) Urban Outfitters regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d) Urban Outfitters was followed by several securities analysts employed by major brokerage firms, such as J.P. Morgan Securities LLC, Janney Montgomery Scott LLC, Jefferies LLC, RBC Capital Markets, Morgan Stanley & Co. LLC, and Oppenheimer & Co. Inc., among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

175.    As a result of the foregoing, the market for Urban Outfitters' securities promptly digested current information regarding Urban Outfitters from all publicly available sources and reflected such information in the prices of Urban Outfitters' securities.

176.    Under these circumstances, all purchasers of Urban Outfitters' securities during the Class Period suffered similar injury through their purchase of Urban Outfitters' securities at artificially inflated prices and a presumption of reliance applies.

177.    At the times they purchased or otherwise acquired Urban Outfitters' securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

178.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and the other members of the Class purchased the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## X.    NO SAFE HARBOR

179.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-

looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Indeed, the risk warnings that may have been provided by Defendants in their Class Period statements, including boilerplate statements that the Company's "performance is subject to worldwide economic conditions" and that "[c]ustomer tastes and fashion trends are volatile and can change rapidly," were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

180. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, as detailed above in the Substantive Allegations section, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Urban Outfitters who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI. PLAINTIFF'S CLASS ACTION ALLEGATIONS

181. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Urban Outfitters between March 12, 2013 and September 9, 2013, inclusive, and who were damaged thereby. Excluded from the

Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

182. Because Urban Outfitters has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable. According to Urban Outfitters' SEC filings, as of shortly before the close of the Class Period, Urban Outfitters had approximately 147 million shares outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

183. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

184. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

185. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

186. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f) whether the market prices of Urban Outfitters' securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Urban Outfitters' stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

187. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

188. During the Class Period, Urban Outfitters and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiff, and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Urban Outfitters' publicly traded securities; and (iii) cause Plaintiff and the other members of the Class to purchase Urban Outfitters' publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Urban Outfitters and the Individual Defendants, and each of them, took the actions set forth herein.

189. These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Urban Outfitters, as alleged below.

190. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and

promotion, financial condition, and operational performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

191. Urban Outfitters and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Urban Outfitters' faltering product assortment and resultant decelerating sales growth, as specified herein.

192. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Urban Outfitters' value, performance and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about Urban Outfitters' sales growth and omitting to state material facts necessary in order to make the statements made about sales growth not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Urban Outfitters' securities during the Class Period.

193. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (i) the Individual Defendants were high-level executives at the Company during the Class Period; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in, the creation, development, and reporting of the Company's sales, marketing, projections, and/or

reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's sales trends and promotional activities at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

194. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing information regarding the Company's decelerating sales growth from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants' misstatements and omissions throughout the Class Period regarding the strength of Urban Outfitters' product assortments and continued sales momentum, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

195. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Urban Outfitters' securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Urban Outfitters' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the

integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with deliberate recklessness by, Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Urban Outfitters' securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

196.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of Urban Outfitters' fraudulent practices, the true nature and prospects of its sales growth, or Urban Outfitters' true intrinsic value, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Urban Outfitters publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

197.    By virtue of the foregoing, Urban Outfitters and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

198.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from Urban Outfitters' stock.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
### ACT AGAINST THE INDIVIDUAL DEFENDANTS

199.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against the Individual Defendants.

200.    The Individual Defendants acted as controlling persons of Urban Outfitters within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

202.    As set forth above, Urban Outfitters and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful

conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from Urban Outfitters' stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

(a)    Declaring that this action is a proper class action and certifying Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 10, 2014

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS

_____
DEBORAH R. GROSS

John Wanamaker Building
100 Penn Square East, Suite 450,
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)
debbie@bernardmgross.com

*Liaison Counsel*

ROBBINS GELLER RUDMAN
   & DOWD LLP
PAUL J. GELLER
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
jreise@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

*Lead Counsel for Plaintiff*

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770-392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2014, I caused the foregoing to be served on the following parties via e-mail:

MORGAN, LEWIS & BOCKIUS LLP
MARC J. SONNENFELD
KAREN PIESLAK POHLMANN
1701 Market Street
Philadelphia, PA 19103
Telephone: 215-963-5000
215/963-5001 (fax)
msonnenfeld@morganlewis.com
kpohlmann@morganlewis.com

*Counsel for Defendants Urban Outfitters, Inc.,*
*Richard A. Hayne, Frank J. Conforti,*
*Tedford G. Marlow*

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS

DEBORAH R. GROSS