**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


In re URBAN OUTFITTERS, INC.      :      **CIVIL ACTION**
**SECURITIES LITIGATION**          :
                                        :
                                        :     **NO.  13-5978**


## MEMORANDUM

**RESTREPO, J.**                                                **MAY 4, 2015**

      Lead Plaintiff, David A. Schwartz ("Plaintiff"), brings this class action, on behalf of himself and all persons or entities who purchased or acquired shares in Urban Outfitters, Inc. ("Urban") between March 12, 2013 and September 9, 2013 ("Class Period"), against defendants Richard A. Hayne, Frank J. Conforti, and Tedford G. Marlow ("Individual Defendants") and Urban.  Plaintiff alleges that, during the Class Period, defendants engaged in a fraudulent scheme to artificially inflate the stock price by misrepresenting and concealing information related to failed product assortments and the resulting deceleration in sales growth during the first half of fiscal year 2014, leading up to and including Urban's back-to-school season.  Plaintiff's Amended Complaint asserts two Counts: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act") and Rule 10b-5 promulgated thereunder against all defendants; and (2) violations of Section 20(a) of the Exchange Act against the Individual Defendants.

      Before the Court is defendants' Motion to Dismiss the Amended Class Action Complaint, and plaintiff's opposition thereto.  For the following reasons, defendants' motion is denied.

# I. BACKGROUND

## (A) The Parties

Urban is a specialty retail company with its principle executive offices in Philadelphia, Pennsylvania. The company is inclusive of five brands: Urban Outfitters ("UO"); Anthropologie; Free People; Terrain; and BHLDN. Each of these brands sells a diverse mix of fashion products, such as apparel, accessories, and home goods, and offers their customers multiple venues for shopping, including retail stores, e-commerce websites, and mobile and on-line catalogs. UO's target customers are teenagers and young adults in their twenties. Anthropologie targets "sophisticated" women in their late twenties to mid-forties, and Free People targets young women aged 25 through 30. Urban owns over 500 retail stores world-wide, and Urban's largest brands, UO and Anthropologie, each operates over 150 stores within the U.S. Defendant Hayne is the co-founder, Chief Executive Officer ("CEO"), and President of Urban, as well as the Chairman of Urban's Board of Directors. Defendant Conforti is the Chief Financial Officer ("CFO") of Urban, and defendant Marlow is a CEO of Urban.

On January 7, 2014, this Court appointed plaintiff to serve as the Lead Plaintiff in this suit, on behalf of himself and others who purchased common stock in Urban during the Class Period. Plaintiff purchased Urban's stock within the Class Period.

## (B) Urban's Finances

Retail segment sales, most of which are attributed to the UO and Anthropologie brands, make up the majority of Urban's business. Urban's overall comparable retail segment net sales[1]

---

[1] Comparable retail segment net sales are described as the "sum of comparable store plus comparable direct-to-consumer channels." A store or direct-to-consumer channel is "considered to be comparable if it has been open at least one full fiscal year," or if it is a store, "it was [not] materially expanded or remodeled . . . or was [] otherwise operating at its full capacity." *See* Defs.' Ex. 10, at 1-2. Comparable

("sales") for fiscal year 2014 amounted to $3,086,608, of which $1,369,302, or 44%, were sales by the UO brand. Anthropologie's sales were $1,264,242, or 41% of Urban's overall sales, in fiscal 2014. This is in contrast to the 47% and 40% of Urban's sales attributed to UO and Anthropologie brands, respectively, in fiscal 2013. Free People's sales amounted to 11% of Urban's total sales in fiscal 2013, which increased to 13% in fiscal 2014.

Because a dominant portion of Urban's business is comprised of UO's sales, a "significant portion of operating income" is earned from August through December when teenagers are more active in the retail market which included the back-to-school and holiday seasons. Moreover, "any decrease in sales or margins during this period . . . could have a more material adverse effect on [Urban's] business [and] financial condition . . . than in other periods." *See* Defs.' Ex. 1, at 7.

Urban's fiscal year ends on January 31 of each year and includes all financial transactions which occurred after January 31 of the previous year; for example, January 31, 2013 marked the end of fiscal 2013. For each of the annual and quarterly reporting periods in 2013, Urban released its report a little over a month after the end of each period. The results of Urban's fourth quarter of fiscal 2013 (which ended January 31, 2013) was first reported on March 11, 2013, its results for the first quarter of fiscal 2014 (which ended April 30, 2013) was released on May 20, 2013, the results of the second quarter of fiscal 2014 (which ended on July 31, 2013) was reported on August 19, 2013, and Urban's results for the third quarter of fiscal 2014 (which ended on October 31, 2013) was released on November 18, 2013. The Class Period starts and ends in the middle of the first and third quarters of fiscal 2014.

---

sales illustrate the financial health of a retailer's business by "excluding any sales growth attributable to new store openings or other forms of expansion" and looking only at the same-store sales. *See* Pl.'s Am. Compl. ¶ 39-42.

While the teen retail market struggled financially, Urban's sales grew each quarter of fiscal 2013. Indeed, by the end of the third quarter, Urban as a whole had sales growth of 8% and UO's sales had grown by 7%. In contrast, major competitors of UO, such as Aeropostale, Abercrombie & Fitch, and American Eagle, experienced a sales decrease by 15%, 14%, and 5%, respectively. After the fourth quarter of fiscal 2013, Urban and the UO brand each experienced their highest sales growth, 11%, for the year.

The increase in company's sales growth continued into fiscal 2014, growing by 9% in the first and second quarters, then 7% in the third quarter, while UO's competitors sustained further sales declines. However, within Urban, UO's sales growth faltered unlike the rest of Urban's brands. In the first and second quarters of fiscal 2014, UO's sales grew by 6% and 5%, respectively. On the other hand, Anthropologie's sales increased by 8% and 9% in the first and second quarters, respectively, while Free People experienced significant growth of 44% during the first quarter and 38% in the second quarter.

On September 9, 2013, prior to the end of the third quarter, Urban commented on the company's third quarter results in its filing of the second quarterly report and stated that sales growth, thus far, was "mid single-digit positive." *See* Am. Compl. ¶ 147. The following day, Urban's stock price fell from $42.71 to $38.35. The trading volume was abnormally high on this day – eight times the average daily volume in the past ten days. On September 11, 2013, at the Goldman Sachs Global Retailing Conference, Conforti confirmed that declining sales of UO had affected the sales growth of the entire company. By the end of the third quarter, Urban reported that the company achieved sales growth of 7%. The performance greatly varied across the individual brands at Urban: Free People and Anthropologie were successful with sales growth of 30% and 13%, respectively, while UO experienced a sales decrease in the third quarter by 1%.

Analysts at Janney Capital Markets, Wells Fargo Securities, and William Blair remarked that UO's sales had slowed during the critical back-to-school season.

### (C)  Plaintiff's Confidential Witnesses

Plaintiff alleges that the sudden decline in sales growth of Urban in the third quarter was not surprising to Urban employees who were aware of the persistent increase in markdowns and promotional activity, which started in the beginning of the fiscal year.  Six confidential witnesses who are former employees of UO attest to the increase in markdowns and promotional activity in UO stores across the country.  Some of these witnesses claim that while working as employees at UO stores, they personally observed that there was an overflow of inventory and frequent and extended periods of sales.  Except for two witnesses who discontinued their employment at UO in February and April of 2013, respectively, the witnesses remained at UO from before the start of and through the end or nearly to the end of the Class Period.

The Amended Complaint lists for each confidential witness ("CW"): time of employment at UO; location of employment; title of position; job duties; and direct supervisor.  All of these witnesses agree that via Urban's Intranet page, accessible only to employees, employees at all UO stores were able to access sales figures of any Urban brand stores.  Further, witnesses report that through the "URBN Sales Page" on the Intranet, an employee could access UO's total sales in North America.  Also available on the Intranet was a company-wide weekly newsletter, "The Slant," released by Urban headquarters, which provided promotional and sales events and markdowns to be instituted at the UO stores.  Witnesses state that they observed Urban's Intranet page leading up to or during the Class Period and noticed a continued decline in sales and an

increase in markdowns and promotional activity in the UO brand throughout the country in early 2013 and during the Class Period.

### (D) The Alleged Fraudulent Scheme

Plaintiff alleges that defendants misrepresented the financial condition of Urban's largest brand during the Class Period, allowing defendants to sell their stock at inflated prices. Specifically, plaintiff claims that defendants concealed from investors that UO's sales growth had been decreasing throughout 2013, while promotional activity was increasing, which eventually affected the sales growth of Urban as a whole. Further, plaintiff asserts that defendants were aware of the struggles of the UO brand, or were at least reckless in affirmatively making statements to the contrary. In alleging this, plaintiff relies on information provided by CWs, SEC filings certified by defendants Conforti and Hayne, unusual and suspicious stock sales by defendants Conforti and Hayne, and that UO revenues make up the majority of the business for Urban as a whole. In response, defendants adamantly deny that defendants were aware of the information as alleged by plaintiff's CWs or that their stock sales were part of a scheme to take advantage of artificially inflated stock prices.

Plaintiff and defendants agree that on March 22, 2013, Hayne sold around 1.2 million shares of common stock in Urban, valued at over $50 million. On April 2, 2013, Conforti sold 5,000 shares of common stock. Conforti sold 22,000 more shares on September 3, 2013, and the total worth of stocks sold by Conforti is valued at over $1.1 million and amounts to more than 99% of his holdings. A week later, Urban reported its update on third quarter sales, which was followed by a drop in Urban's stock price by more than 10%. As a result of his investment in Urban and the subsequent depreciation in stock price, plaintiff suffered a monetary loss.

## II. STANDARD OF REVIEW

### (A) Rule 12(b)(6)

A motion to dismiss will be granted if the plaintiff "fails to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. Rule 12(b)(6). Courts must "accept all factual allegations as true, construe the Complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the Complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotation marks omitted). However, the Supreme Court clarified in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), that "formulaic recitation of the elements of a cause of action will not do[, and] . . . [f]actual allegations must be enough to raise a right to relief above the speculative level." A claim must be facially plausible to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A Complaint which alleges a mere possibility that a defendant has acted unlawfully does not "state a plausible claim for relief" to survive a motion to dismiss. *Id.* at 679. Further, on a motion to dismiss in a Section 10(b) action, courts must also consider the Complaint in its entirety, as well as other sources courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, including documents incorporated into the Complaint by reference, and "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**(B) Heightened Pleading Standard under Section 10(b) and Rule 10b-5**

Section 10(b) of the Act prohibits the use of any "manipulative or deceptive device" or schemes in connection with the purchase or sale of securities. *In re Ikon Office Solutions, Inc*., 277 F.3d 658, 666 (3d Cir. 2002) (quoting 15 U.S.C. § 78j(b)). In order to enforce this statute, the Securities and Exchange Commission ("SEC") promulgated Rule 10b-5, which "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim under Section 10(b) of the Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of security; (4) reliance, or transaction causation in fraud-on-the-market cases; (5) economic loss; and (6) loss causation, or a causal connection between the material misrepresentation or omission and the loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Moreover, Congress imposed specialized pleading requirements on plaintiffs bringing claims under Section 10(b) of the Act and Rule 10b-5: Federal Rule of Civil Procedure 9(b) for fraud actions; and the Private Securities Litigation Reform Act of 1995 ("PSLRA") for securities fraud cases. *Mill Bridge V, Inc. v. Benton,* 2009 WL 4639641, *6 (E.D. Pa. Dec. 3, 2009). Thus, Complaints sounding in fraud must satisfy the heightened pleading standards of Rule 9(b). *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004). Rule 9(b) requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Benton*, 2009 WL 4639641, at *6 (quoting Fed. R. Civ. P. 9(b)); *see Alpharma Inc.*, 372 F.3d at 148. Specifically, under Rule 9(b), a pleading under Rule 10b-5 must

state: "(1) a [] false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *In re Rockefeller Ctr. Prop., Inc. Sec. Litig*., 311 F.3d 198, 216 (3d Cir. 2002) (citing *Shapiro v. UJB Fin. Corp*., 964 F.2d 272, 284 (3d Cir. 1992)). Thus, plaintiffs bringing securities fraud claims must allege, "the 'who, what, when where, and how' of the events at issue." *Alpharma*, 372 F.3d at 148.

In addition, under the PSLRA, plaintiff must "specify [in the Complaint] each statement alleged to have been misleading [and] the reason or reasons," and "if the allegation regarding the statement or omission is made on information and belief, [then] . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Further, the PSLRA requires that the plaintiff allege particular facts from which it can be strongly inferred that the defendant acted with the required state of mind. *Id.* § 78u-4(b)(2)(A). The required state of mind, or "scienter," is a mental state with "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). A Complaint will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## III.     DISCUSSION

### (A)  Actionable and Material Misstatements and Omissions

#### i.  *Misstatements and Omissions*

As explained above, in order to plead the element of material misrepresentation or omission in a Rule 10b-5 claim, plaintiff must specify the statements alleged to have been misleading, or omission of "a material fact necessary in order to make the statements made, in

the light of the circumstances in which they were made, not misleading," and the reasons why these statements or omissions are misleading. 15 U.S.C. § 78u-4(b)(1)(B). In addition, the plaintiff must identify the source of the alleged misrepresentation or nondisclosure. *Alpharma*, 372 F.3d at 148.

Defendants contend that plaintiff does not identify which of defendants' statements or omissions were false or misleading. *See* Defs.' Mot. 9. Plaintiff responds that defendants made numerous statements and omissions that would be found false or misleading by a reasonable investor, which have been identified and explained in detail in his pleading. *See* Pl.'s Br. at 8-9. A review of plaintiff's Amended Complaint reveals that plaintiff has properly identified several statements and has supported his claim with sufficient detail.

First, plaintiff quotes Hayne's statements during the conference call on March 11, 2013 regarding strong sales trends and decreased markdowns. *See* Am. Compl. ¶ 94-95. Taking all allegations in the Amended Complaint as true, in the early months of 2013, sales trends were decreasing and markdowns were increasing. *Id.* ¶ 110(a)-(e). Therefore, Hayne's statements were properly identified as false.

Second, plaintiff points to Conforti's statements during the UBS Global Consumer Conference on March 13, 2013. *Id.* ¶ 103. In response to an analyst's question on sales trends, Conforti implied that sales trends for all Urban brands were consistent with the preceding year's holiday period. *Id.* Again, to the extent that plaintiff's allegations are accepted as true, the facts were contrary to Conforti's statement. *Id.* ¶ 110(a)-(e).

Third, plaintiff highlights comments made by defendants during a conference call held on May 20, 2013. *Id*. ¶ 118. Conforti stated that there was "a reduction in merchandise mark

downs" while referring to Urban's revenues as a whole.  *Id*; Defs.' Ex. 8, at 2.  In light of the facts as alleged by plaintiff, Conforti's statement was false.  *See* Am. Compl. ¶ 129(a)-(e).

Fourth, plaintiff refers to statements made by defendants during a conference call held on August 19, 2013 as false and misleading.  *Id.* ¶ 133.  During this call, both Conforti and Hayne remarked that Urban as a whole reduced its merchandise markdowns, and Hayne minimized any concerns about UO's sales growth as compared to the previous year by stating that "second-quarter results last year were especially strong."  *Id.*; Defs.' Ex. 9, at 2, 5.  In addition, Conforti responded to an analyst's questions about sales trends that August sales for the company were comparable to the "strength" of the sales in July, and that July sales trends "mirrored . . . the entire quarter."  *See* Am. Compl. ¶ 135; Defs.' Ex. 9, at 6.  Further, when questioned by an analyst on the reason for the lower average selling price for UO, Hayne stated that there was no particular "change of philosophy or . . . strategy around average selling price."  *See* Am. Compl. ¶ 146; Defs.' Ex. 9, at 12.  If Urban's largest brand, UO, was experiencing a decrease in sales growth and an increase in markdowns, then Conforti's and Hayne's statements during the August conference call implying the opposite were, at the least, misleading.  *Id.* ¶ 146(a)-(f).

Lastly, plaintiff refers to information contained in Urban's SEC filings throughout 2013, which defendants Conforti and Hayne certified as true, stating that there was "a reduction in merchandise markdowns" across Urban brands.  *See* Am. Compl. ¶¶ 88-89, 105, 107-08, 116, 126; *see* Defs.' Ex. 5, at 2; Defs.' Ex. 6, at 2.  According to plaintiff's allegations, however, such statements in the SEC filings were false.  *See* Am. Compl. ¶¶ 110(e)-(g), 129(e)-(g).

## ii. Particularized Facts

Defendants also argue that plaintiff has failed to provide sufficiently particularized facts in his Amended Complaint to support the allegation that defendants' statements were false or misleading. *See* Defs.' Mot. 20-22. Defendants contend that the alleged sales declines and increase in markdowns have to be specified by amounts and dates in order to satisfy the PSLRA requirements. *Id* at 20-21. Further, defendants state that plaintiff's confidential sources are not described with sufficient particularity or were not in a position to know the information they allege, and therefore, statements made by these sources should be discounted. *Id.* at 21-22.

In circumstances involving a "distortion of data disclosed to the public by using unreasonable accounting practices," plaintiffs bringing a Section 10b action must plead in detail what these accounting practices were and how the data was distorted to mislead investors. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). For example, if a plaintiff claims that defendants in a securities fraud case altered or obtained the values for bad debt reserves or account receivables in violation of GAAP procedures, then the Complaint must specify when and to what level, why, and how many accounts or reserves were distorted or falsified. *Freed v. Univ. Hlth. Servs., Inc.*, 2005 WL 1030195, *9 (E.D. Pa. May 3, 2005) (quoting *In re Loewen Group, Inc. Sec. Litig.*, 2004 WL 1853137, *11 (E.D.Pa. Aug. 18, 2004)). However, a Complaint which alleges the defendant CEO in a securities fraud case misrepresented to investors that the demand for his company's products was "solid," "strong," and "good" when the actual condition of sales was "disappointing" and had "declined," is sufficiently particularized to satisfy PSLRA requirements. *In re ATI Tech., Inc. Sec. Litig.*, 216 F. Supp.2d 418, 424, 435-36 (E.D. Pa. 2002); s*ee In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp.2d 814, 819-20 (E.D. Pa. 2001) (Complaint was found sufficient to survive motion to

dismiss where plaintiff alleged that credit card company committed securities fraud by using fraudulent business practices to raise revenue, such as charging customers without consent or lying about interest rates to make sales, even though plaintiff did not specify when and how many customers were defrauded or how much of the revenue was obtained through improper tactics).

Here, plaintiff is not alleging that defendants engaged in any unreasonable accounting methods to distort the financial reports. *See* Tr. Oral Arg. 9/19/14 (hereinafter cited as "Oral Arg."), at 47:2-14. Rather, plaintiff is claiming that defendants did not disclose the financial performance of one of Urban's brands in order to influence the value of stock in the entire company. *See* Am. Compl. ¶ 83. Plaintiff's allegations in the Amended Complaint with regard to sales and markdowns are sufficient to survive at this stage of the proceedings. *See, e.g., ATI Tech.*, 216 F. Supp.2d at 435-36; *Providian Fin. Corp.*, 152 F. Supp.2d at 819-20.

To the extent defendants argue that the allegations regarding the CWs plaintiff rely on have not been sufficiently particularized, *see* Defs.' Mot. 21, defendants' motion is denied as well. To make allegations in a Complaint based on a confidential source, a plaintiff must "describe[] [the witness] with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

Defendants contend that in *Chubb*, the Third Circuit found that the plaintiff did not describe the anonymous sources with sufficient particularity because the Complaint did not give dates of employment for the sources, dates when these sources learned the information they possessed, or how the sources had access to or obtained the information. *See* Defs.' Mot. 21

(citing *Chubb*, 394 F.3d at 146, 148). However, each of these factors are not strictly required to

find that a confidential source, who was relied upon in a securities fraud Complaint, has been

sufficiently particularized. *In re Cabletron Sys., Inc*., 311 F.3d 11, 32 (1st Cir. 2002) (Complaint

which satisfies the requirements of PSLRA as a whole will survive a motion to dismiss, despite

"some questions remain[ing] unanswered"). The Third Circuit explained that the proper test

entails evaluating "the detail provided by the confidential sources, the sources' basis of

knowledge, the reliability of the sources, the corroborative nature of the other facts alleged,

including from other sources, the coherence and plausibility of the allegations, and similar

indicia." *Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 263 (3d Cir. 2009) (quoting

*Chubb*, 394 F.3d at 147); s*ee also City of Edinburgh Council v. Pfizer, Inc*., 754 F.3d 159, 168

n.11 (3d Cir. 2014); *Solomon-Shrawder v. CardioNet, Inc*., 2010 WL 3168366, *9 (E.D. Pa.

Aug. 10, 2010); *In re Adolor Corp. Sec. Litig*., 616 F. Supp. 2d 551, 574 (E.D. Pa. 2009). For

example, the Third Circuit found a pleading relying upon information provided by CWs was

sufficient when plaintiffs pled "that former [] employees on whom [the plaintiffs] rely worked at

the Company during the Class Period and had personal knowledge of the practices they

described occurred, that their consistent accounts reinforced one another, . . . employees were

familiar with the activities discussed, [] the sources provided an abundant level of detail, and

significantly, [] the sources have a strong basis of knowledge for the claims they make." *Chubb*,

394 F.3d at 150 n.14 (citing *Cabletron*, 311 F.3d at 30-31).

Similarly, here, plaintiff describes for each of the six confidential sources who are former

employees of UO: period of employment at UO by month and year; job position; store location;

direct supervisor; job responsibilities; and how the individual had access to the nation-wide data

on UO sales trends and promotional activity.[2]  *See* Am. Compl. ¶¶ 26(a)-(f), 68-73.  Moreover, several of the CWs in locations throughout the United Sates, asserted the existence of unusual promotional activity and lagged sales trends in each of their stores.  *Id.* ¶ 68-70; s*ee Avaya*, 564 F.3d at 264 (CWs' statements that the defendant company was engaged in "deep and unusual discounting, although anecdotal," was found sufficient to support allegations that the defendant's statements were misleading).  The allegations in plaintiff's Amended Complaint regarding the information provided by the CWs are adequately particularized to survive at this stage of the proceedings.

### iii.  PSLRA Safe Harbor

Defendants claim that even if plaintiff had properly identified defendants' misstatements and omissions, and the pleading is sufficiently particularized, defendants' statements are protected under the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c).  Therefore, defendants contend that the Amended Complaint should be dismissed because defendants cannot be held liable for statements covered under that provision.

Under the safe harbor provision, a forward-looking statement is protected from liability, provided that: "the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood."  *Avaya*, 564 F.3d at 254.  Any "characterizations of past events or

---

[2] Although two of the confidential sources were no longer working for UO by the start of the Class Period, the Third Circuit has noted that post-Class and pre-Class-Period data is relevant if it could reveal whether defendants' statements made during the Class Period were false or materially misleading. *Rahman*, 736 F.3d at 245 n.11; *Avaya*, 564 F.3d at 249 n.13; *In re Merck & Co., Inc. Sec. Litig*., 432 F.3d 261, 272 (3d Cir. 2005).  In the Amended Complaint in this case, the former employees allegedly reveal that the decreasing sales trends and increase in promotional activity existed prior to defendants' statements to the contrary, and plaintiff's reliance on these sources is appropriate.

current conditions," or prefacing otherwise non-forward-looking statements with "words of futurity or belief" does not bring the statements within the protection of the safe harbor. *Frater v. Hemispherx Biopharma, Inc.,* 996 F. Supp.2d 335, 348 (E.D. Pa. 2014) (citing *Avaya*, 564 F.3d at 255) (citation and internal quotation marks omitted). Moreover, a mixed statement that makes reference to both a future event and a present event is not protected by the safe harbor provision with respect to the part of the statement that refers to the present. *Avaya*, 564 F.3d at 255. For example, a proper interpretation of a communication that sales were "still going strong," is "both that current sales were strong and that they would continue to be so, at least for a time." *Id.* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("Tellabs II")). Accordingly, such a statement is not entitled to safe harbor protection to the extent is makes a representation concerning current sales. *Id.* (citing *Tellabs II*).

Like the statement that sales were "still going strong" in *Tellabs II*, defendants' statements that "sales trends continue to be strong" and that there is "no reason to believe that we couldn't see a continued decrease in markdowns" include references to UO's current sales and markdown activity. *See* Am. Compl. ¶¶ 94, 95. Further, defendants' statements that the "sales trend [is] consistent with our holiday period," and that there has been "a reduction in merchandise markdowns" compare current conditions to past events. *Id.* ¶¶ 103, 118. Similarly, the signatures of defendants Conforti and Haynes on Urban's SEC filings, which filings include the statement that there has been a "reduction in markdowns" across its brands, is a comparison of Urban's historical performance with its present condition. *Id.* ¶¶ 88-89, 105, 107-08, 116, 126.[3] These statements made by defendants are not afforded PSLRA's safe harbor protection

---

[3] A company's high-level officer, who signs and certifies as true the company's financial statements submitted to the SEC, can be held liable for any misstatements or omissions contained in the filing. *Am. Bus.*, 413 F. Supp. at 396.

insofar as they characterize "past events or current events," *see Frater*, 996 F. Supp.2d at 348, or make reference to both future events and present events, *see Avaya*, 564 F.3d at 255.

### iv.   Materiality

Defendants also argue that their alleged misstatements and omissions are not material, and therefore, could not be misleading.  *See* Defs.' Mot. 12-16.  A misstatement or omission is material if there is "a substantial likelihood that the [misstatement or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  An alleged misstatement or omission concerning a fact already made publicly available cannot be materially misleading, because "reasonable investors . . . exercise due investment diligence."  *In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767, *11 (E.D. Pa. Nov. 1, 2006).  Further, statements of "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism" constitute no more than mere puffery, and are regarded as such by investors.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (quoting *EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)).  Generally, materiality is an issue of fact to be decided by the trier of fact, but pleadings that allege omissions or misrepresentations that "are so obviously unimportant . . . [can be ruled] immaterial as a matter of law at the pleading stage."  *Burlington Coat Factory*, 114 F.3d at 1426.

As to omissions, there is no affirmative duty to disclose material facts, except when an omission makes the statement misleading.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011).  Generally, the duty to disclose arises when "there is insider trading, a statute

requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000). The prior disclosure which gives rise to a duty to disclose, also termed by the Third Circuit as the "duty to correct," is "a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. The company then must correct the prior statement within a reasonable time." *Burlington Coat Factory*, 114 F.3d at 1431 (quoting *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331-32 (7th Cir. 1995)).

Applying the standard for materiality, the operative pleading in this case should be dismissed for failure to state a claim if allegations of the increase in promotional activity and decrease in growth of UO's sales would be obviously unimportant to a reasonable investor. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004). First, defendants' alleged misstatements and omissions imply that there is a strong demand for UO's products. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (holding that the defendant's statement was material when he claimed the demand for the company's product was strong). In that UO's sales make up a dominant share of Urban's business, information on UO's financial stability and success would significantly alter the "total mix" of information available to a reasonable investor. *Matrixx*, 131 S. Ct. at 1323 (information that could impact future sales of the leading product for the company was material). Further, defendants' misrepresentations are not puffery, because they provide "concrete information about the performance [and business practice] of [a] specific" brand. *ATI*, 216 F. Supp.2d, at 436.

In addition, defendants argue this information was not material because they claim this information was already publicly available, since the sales results regularly released by the company reflected sales declines and markdowns. *See* Defs.' Mot. 21. However, Urban's press

releases contain the financial information for the company as a whole and do not separate the data to reveal the financial performance of each individual brand. *See* Defs.' Exs. 1-7. According to plaintiff's Amended Complaint, the financial successes of Anthropologie and Free People more than compensated for the financial shortcomings of UO, so that the market would not be able to recognize that Urban's largest brand, UO, was experiencing lagged sales and heavy promotional activity. *See* Am. Compl. ¶ 75. "[A]ccurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading." *ATI*, 216 F. Supp.2d at 436. Only after the Class Period ended did Urban report the negative impact of increased markdowns in the UO brand on gross profit of the entire company. *See* Defs.' Ex. 3, at 6. For example, in Urban's sales report for the third quarter of fiscal 2013, Urban stated that the "improvement in gross profit rate . . . was primarily due to a reduction in merchandise markdowns and improved initial merchandise margins at the Anthropologie and Free People brands, [but] these improvements were partially offset by an increase in merchandise markdowns at the Urban Outfitters brand in North America." *Id*.

Moreover, an argument that the defendants did not have an affirmative duty to disclose all material information, and therefore, defendants cannot be liable for their omissions, is to no avail. At various times during the Class Period, defendants made similar statements on the issues of sales trends and promotional activity of UO. By specifically pointing out these areas of UO's business activities, defendants put these topics "in play" and triggered a duty to disclose and correct any "inaccurate or misleading prior disclosure." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173-74 (3d Cir. 2014); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp.2d 814, 825 (E.D. Pa. 2001). Hence, defendants had an affirmative duty to truthfully represent the material facts concerning markdown activity and sales trends at UO.

**(B) Scienter**

Defendants also contend that plaintiff has not adequately pleaded the element of scienter. *See* Defs.' Mot. 23-27. Plaintiff responds that scienter has been sufficiently pled by allegations in the Amended Complaint that: (1) UO is a core operation of Urban; (2) defendants had access to the Intranet, which Urban's corporate headquarters used to publish on a daily basis the sales data and promotional activity for each of Urban's brands; (3) defendants Conforti and Hayne signed forms certifying Urban's SEC filings as reviewed and true; and (4) defendants Conforti and Hayne engaged in unusual and suspicious stock sales during the Class Period. *See* Am. Compl. ¶¶ 81-82, 165-71. However, defendants point to a perceived lack of allegations in the Amended Complaint asserting that CWs had personal knowledge of either defendants accessing the employee Intranet, or that defendants were aware of the sales declines and increased promotional activity. *See* Defs.' Mot. 24. Defendants also argue that plaintiff's motive allegations, particularly defendants' stock sales, and plaintiff's reliance on the core operations doctrine, are insufficient to plead scienter. *Id.* at 24-26.

Under the PSLRA's heightened pleading requirements, a Complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Courts must evaluate all of the allegations in totality, to determine whether they give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 323. Hence, courts must not examine any one allegation in isolation from the rest, but rather, after a holistic evaluation of the facts as alleged, consider any plausible opposing inferences. *Id.* "The inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences." *Id.* (internal quotation marks omitted). Allegations giving rise to a strong inference of scienter include: "(a) [] alleging facts to

show that defendants had both motive and opportunity to commit fraud, or (b) [] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat Factory*, 114 F.3d at 1418.

### i. Conscious Misbehavior or Recklessness

Reckless statements are "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (internal quotation marks omitted). To show conscious misbehavior or recklessness, a plaintiff must make specific allegations which constitute "strong circumstantial evidence." *In re Radian Sec. Litig.*, 612 F. Supp.2d 594, 613 (E.D. Pa. 2009) (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004)). Plaintiff's allegations here, including those regarding plaintiff's CWs, "proffer an array of circumstantial evidence giving rise to a strong inference that . . . [defendants'] statements were at least reckless, which is enough to survive a motion to dismiss under the PSLRA." *Avaya,* 564 F.3d at 269.

First, plaintiffs allege that defendants were directly involved with UO's business activities and knew or reasonably should have known of the markdown activity and sales declines at UO. *See* Am. Compl. ¶¶ 18-22. According to the press release transcripts and the SEC filings, Marlow had a leadership role in the UO operations during the Class Period. *See* Defs.' Ex. 8, at 6 (Hayne, instead of responding to a question from an analyst about UO during a press conference, "let Ted Marlow talk about Urban [Outfitters] since he is . . . much closer to it"); Defs.' Ex. 9, at 11 (Hayne described that "[with the] Urban Outfitters brand . . . Ted and his

team faced difficulties" in achieving high sales volume comparable to the previous quarters); Urban Outfitters Annual Rprt. for Period Ending 1/31/13 (Form 10-K), at 42 (April 1, 2013). Included in the SEC filings is a statement that senior executives, also highlighting Hayne's importance to the company, are "fully integrate[d] within the structure of [Urban's] management team and core business." *See* Defs.' Ex. 11, at 3. Conforti and Hayne signed and certified as true Urban's financial documents filed with the SEC, which included statements that there was a reduction in markdowns across Urban's brands. *See* Am. Compl. ¶¶ 88-89, 105, 108-08, 116, 126. These can be probative of scienter when in conjunction with other evidence of recklessness. *Radian*, 612 F. Supp. 2d at 620.

Second, maybe "the most powerful evidence of scienter is the content and context" of the statements made by Conforti and Hayne, which were made "in response to . . . analysts' questions. *See Avaya*, 564 F.3d at 269. In *Avaya*, the defendant CEO of the company was repeatedly asked whether the company's pricing had remained steady despite competitors in the market, and the defendant responded falsely that the company had not engaged in any discounting. *Id.* Similarly, here, Conforti was allegedly asked by an analyst about Urban's sales trends, to which he replied that the trends were strong or similar to previous successful quarters. *See* Am. Compl. ¶ 103. Hayne was also questioned by an analyst about sales trends and average selling price of UO products, to which he denied that there were any unusual or special circumstances affecting either the sales trends or price points. *Id.* ¶¶ 135, 140.[4] In the context of specific inquiries about pricing and sales trends, and the consistent content of Conforti and Hayne's responses, defendants' omission of actual circumstances that were contrary to their answers presents "an obvious risk of misleading investors." *Avaya*, 564 F. 3d at 270 n.43.

---

[4] Although the Amended Complaint attributes this response to Conforti, defendants' exhibit appears to certify that this comment was made by Hayne. *See* Defs.' Ex. 9, at 6.

Accepting plaintiff's allegations as true regarding UO's sales and increased markdown activity, Conforti and Hayne's responses to the contrary are indicative of scienter.

Third, under the core operations doctrine, misstatements and omissions made on "core matters of central importance" to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge. *Rahman*, 736 F.3d at 246-247; s*ee In re Loewen Grp. Inc*., 2004 WL 1853137, *22 (E.D. Pa. Aug. 18, 2004); *In re Cell Pathways, Inc*., 2000 WL 805221, *7 (E.D. Pa. June 20, 2000). UO's sales for fiscal 2014 comprised 44% of all sales by Urban. *See* Defs.' Ex. 2, at 5. Indeed, Urban's financial statements admit that much of the operating income is earned from sales during August through December, and highlights the importance of sales during back-to-school seasons. *See* Am. Compl. ¶ 2; Defs.' Ex. 1, at 7. Hence, UO's financial performance is critical to the financial health of the entire company. As such, defendants would have been alerted to extensive sales declines and markdowns in UO's North American stores, as alleged by the confidential witnesses, and decreasing sales growth at UO as the Class Period progressed. Given that UO is a core operation of Urban, combined with plaintiff's allegations and circumstantial evidence that defendants were aware or should have been aware of the declining sales trends and markdowns at UO, plaintiff's allegations are sufficient to give rise to the strong inference that defendants were, at minimum, reckless in their statements.

### ii. Motive and Opportunity

Plaintiff further supports the inference of scienter through their allegation that defendants engaged in insider trading, and therefore had both motive and opportunity to commit fraud. Stock sales unusual in time and scope may give rise to an inference of scienter. *Avaya*, 564 F.3d

at 279. In other words, "insider trading in suspicious amounts or at suspicious times" that gives rise to an inference of the trader's wrongdoing, can be inferred to the company as well. *Advanta*, 180 F.3d at 540. To determine whether a sale of stock is "unusual," consideration should be made to "amount of profit made, amount of stock traded, the portion of stockholdings sold, the number of insiders involved," "whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation." *In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 277 (3d Cir. 2006) (citations omitted).

While it is noted that during the Class Period, Hayne continued to hold a substantial percentage of his stock in Urban, plaintiff alleges that on March 22 and March 25, 2013, Hayne sold around 1.2 million shares of common stock in Urban, for a total profit over $50 million, *see* Am. Compl. ¶ 169. Plaintiff alleges that Hayne's stock sales were unusual in time and amount, because Hayne had not sold any shares during the 18 months prior to the Class Period. *See* Am. Compl. ¶ 169. Plaintiff also alleges the amount of profit from Hayne's stock sales was likely excessive compared to Hayne's ordinary compensation.[5]

Through sales on April 2 and September 3, 2013, Conforti sold a total of 27,000 shares of common stock. *Id.* ¶ 170. The stocks sold by Conforti are valued at over $1.1 million and amounted to more than 99% of his holdings. *Id.* Similarly to Hayne, Conforti had not sold any of his shares in Urban during the 18 months preceding the Class Period. *Id.*

Moreover, plaintiff alleges specific facts which suggest motive and opportunity on the part of Conforti. Not only did Conforti sell 99% of his holdings during the Class Period, but the

_____

[5] Defendant's counsel represented that Hayne's salary is a dollar a year and that his main form of compensation is from stock sales. See Oral Arg. 14-15. The Third Circuit has noted that a profit from stock sales which is double the amount of average compensation is unusual. *Suprema*, 438 F.3d at 278; *see In re Astea Int'l Inc. Sec. Litig.*, 2007 WL 2306586, *13 (E.D. Pa. Aug. 9, 2007). Assuming for present purposes the accuracy of defendants' counsel's representation regarding Hayne's salary, the amount of profit Hayne earned from his sale of stock would be considered unusual.

timing of his sale of 22,000 shares on September 3, 2013 is particularly suspicious.  A week after

Conforti's sale, Urban made an announcement concerning the third quarter sales growth, which

disappointed the market and resulted in a price drop in Urban stock.  *See* Am. Compl. ¶ 154;

Defs.' Ex. 12.

In considering plaintiff's allegations collectively, plaintiff's Amended Complaint raises a

strong inference of defendants' scienter.  While insider sales can support an inference of scienter,

they are not required.  *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp.2d 378, 402 (E.D.

Pa. 2005).  In any event, plaintiff's alleged facts support, at a minimum, defendants' reckless

conduct, which is sufficient to infer scienter.  *Steamfitters Local 449 Pension Fund v. Alter*, 2011

WL 4528385, *8 (E.D. Pa. Sept. 30, 2011).  Although competing plausible inferences that are "at

least as likely" must be considered, *see Tellabs*, 551 U.S. at 328, defendants have failed to make

"good faith explanations for these misstatements such as to make the inference of scienter less

than strong."  *See Frater*, 996 F. Supp. 2d at 350.  Thus, plaintiff has satisfied PSLRA's

requirements as to scienter.

### (C)  Loss Causation

Defendants assert that plaintiff fails to sufficiently plead loss causation because Urban's

September 9, 2013 SEC filing "revealed nothing about long-festering problems with product

assortment and sales growth problems, nor did the subsequent comments by Conforti on

September 11, 2013 describe the problems as long-standing ones that had lasted since March

2013."  *See* Defs.' Mot. 28.  Therefore, defendants argue that the Amended Complaint should be

dismissed for failure to plead loss causation.  *Id.* at 29.

"Loss causation . . . is a causal connection between the material misrepresentation [or omission] and the loss [suffered]." *In re DVI, Inc., Sec. Litig.*, 2010 WL 3522090, *5 (E.D. Pa. Sep. 3, 2010) (*McCabe v. Ernst & Young*, 494 F.3d 418 (3d Cir. 2007)). A plaintiff alleging loss causation is only required to provide a "short and plain statement," which gives "fair notice" of plaintiff's claim. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). As such, the issue of causation is "usually reserved for the trier of fact." *EP Medsys.*, 235 F.3d at 885. To satisfy loss causation, a plaintiff must show that "the share price fell significantly after the truth became known." *DVI*, 2010 WL 3522090, at *5 (quoting *Dura*, 544 U.S. at 347).

The disclosure of the alleged fraud need not be the sole reason for the depreciation of the stock price; rather, plaintiff must allege facts that indicate the misrepresentation inflated the stock price, and the truth had a proximate and negative impact on the value of stock. *In re Cigna Corp. Sec. Litig.*, 459 F. Supp.2d 338, 349 (E.D. Pa. 2006) (citing *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000)). Although a corrective disclosure must be related to the same subject as the misrepresentation, and not some other adverse facts about the company, there is no requirement that the disclosure mirror the earlier misrepresentation. *Marsden v. Select Med. Corp.*, 2007 WL 1725204, *2 n.7 (E.D. Pa. June 12, 2007). Moreover, the "exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure"; instead, the truth can be revealed through a series of partial corrective disclosures. *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, *31 (D. N.J. Aug. 8, 2011). Further, the market may learn the truth regarding the misrepresentation from "whistleblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals," and other informers who are otherwise not representatives of the company or the company itself. *DVI*, 2010 WL

3522090, at *7 n.12 (citations omitted); *Marsden.*, 2007 WL 1725204, at *2 n.6; *In re*

*Intelligroup Secs. Litig.*, 468 F.Supp.2d 670, 684 n.11 (D. N.J. 2006).

In this case, plaintiff adequately alleges that there was a materialization of a concealed

risk and that a corrective disclosure occurred. The Amended Complaint sufficiently alleges that

defendants engaged in misrepresentations of sales trends and concealed the increase in

promotional activity and markdowns at UO, which was possible due to Urban's financial

statements reflecting the successful financial performance of Anthropologie and Free People in

conjunction with UO. *See* Am. Compl. ¶¶ 75, 155. Plaintiff alleges that during the third quarter

of fiscal 2014, despite the increase in markdowns and sales promotions in an effort to elevate the

depressed sales of UO products, decelerating sales trends at UO became so significant that

Urban's sales growth was negatively impacted. *Id.* ¶ 155. Once defendants announced its sales

numbers as of September 2013, which was below market expectations, plaintiff alleges that

"analysts recognized the importance of these revelations . . . and issued reports highlighting the

threat of the Urban brand to the Company as a whole." *Id.* ¶ 153. Immediately following

"defendants' revelations, and the resulting analyst commentary," the value of the securities in

Urban depreciated dramatically. *Id.* ¶ 154.

The allegations that the financial statement filed by Urban on September 9, 2013, stating

that "thus far during the third quarter of fiscal 2014, comparable Retail segment net sales are mid

single-digit positive," and analysts' immediate reaction to this revelation, suffice as a corrective

disclosure of defendants' misrepresentations regarding UO. *Id.* ¶ 147. From this comment,

analysts were able to draw a connection between the lagged sales growth of the company as a

whole and slowed sales trends in the UO brand. *Id.* ¶ 147. Indeed, analysts were explicit about

the relationship, remarking that there was a "sales slowdown at the Urban division," and the

"entire issue for URBN's slowing sales stems from the UO division, which we believe showed material slowing." *Id.* Moreover, even assuming the September 9 financial statement did not amount to a corrective disclosure, the analysts' comments in response to it suffice to correct defendants' earlier alleged misrepresentations. *DVI*, 2010 WL 3522090, at *7 n.12 (citations omitted). Further, "the fact that the stock price fell without a more complete and detailed disclosure, if anything, only goes to show that the tip of the iceberg was enough to cause the loss." *See In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, *21 (D. N.J. Aug. 17, 2005).

Although defendants respond that this corrective disclosure only points to recent problems within UO, and does not necessarily reveal that there were "long-festering problems" at UO, *see* Defs.' Mot. 28, plaintiff's Amended Complaint survives. *See Bristol-Myers*, 2005 WL 2007004, at *21 (when ruling on a motion to dismiss, the court should not be "concerned with pinning down which, among alternate versions of the same truth, might have caused the loss"); *Cigna*, 459 F. Supp. 2d at 356 (issues of whether the alleged fraud was the sole reason for the inflated price of stock, and whether any prior and partial corrective disclosures impacted the price of stock before the final corrective event, were disputes of material fact and basis for denial of summary judgment). Plaintiff has adequately alleged a materialization of the concealed risk as well as a corrective disclosure, and plaintiff's Amended Complaint is sufficient to survive at this stage of the proceedings.

### (D) Section 20(a)

Defendants contend that plaintiff's Section 20(a) claim must be dismissed because it is derivative of the Section 10(b) claim. *See Avaya*, 564 F.3d at 252. However, in that plaintiff has

stated a claim under Section 10(b) and Rule 10b-5, plaintiff's Section 20(a) claim survives.[6] *See id.*

An appropriate Order follows.

---

[6] Section 20(a) of the Act creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). *Avaya*, 564 F.3d at 252 (citing 15 U.S.C. § 78t(a)). Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *Id.* (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)).